PEOPLE *v.* ONESTO.

1. CRIMINAL LAW—MURDER—EVIDENCE — SUFFICIENCY — QUESTION FOR JURY.

In a prosecution for murder, evidence reviewed, and *held*, sufficient to furnish a foundation for the inference of guilt which the people sought to draw from it, and that the court below was not in error in submitting to the jury the question of defendants' guilt.

2. SAME—JOINT DEFENDANTS—CONSPIRACY—TRIAL — INSTRUCTIONS —EQUALLY GUILTY.

Where defendants were jointly charged with murder, it being the theory of the people that they conspired together in Chicago to kill deceased and that they came to Benton Harbor and worked it out in accordance with a preconcerted plan, and there was no room in the testimony for the jury to' find that one defendant, although he did not actually do the killing, was guilty of any other or different offense than the other, the court was not in error in instructing the jury that he was equally guilty or should be acquitted.

3. SAME—MANSLAUGHTER—INSTRUCTIONS.

Where the court, in his principal charge, defined at some length murder in the first and second degrees, also manslaughter, and later, in reply to the request of a juror, defined manslaughter again, there is no merit in the complaint that he did not draw a distinction between second degree murder and manslaughter in reply to the request of the juror.

4. SAME—EXHIBITS IN JURY ROOM—DISCRETION OF COURT—APPEAL AND ERROR.

Where the particular circumstances attending the refusal of the court below to allow an exhibit to be taken to the jury room do not appear in the record, it cannot be said by this court that there was an abuse of discretion.

Error to Berrien; Bridgman, J. Submitted June 14, 1918. (Docket No. 102.) Decided December 27, 1918.

Tony Onesto and Frank Damico were convicted of murder in the second degree.    Affirmed.

*Frank De Bartolo* and *O'Hara & O'Hara,* for appellants.

*Alex. J. Groesbeck,* Attorney General, and *John J. Sterling,* Prosecuting Attorney, for the people.

BIRD, J.    Respondents were jointly charged in the Berrien circuit court with having murdered one Henry Pontorno in that county on August 1, 1916.    They were found guilty of murder in the second degree and sentenced on March 5, 1917.    The proceedings have been brought to this court for review with the claim that errors were committed on the trial which should reverse the judgment of conviction.

1 and 2.  The first and second errors assigned are based upon the refusal of the court to direct a verdict for defendants, or either of them, at the close of the people's case.    It is the claim of counsel that the testimony did not warrant the conviction of either respondents, especially of Damico.

The proofs upon which conviction was had. show substantially the following facts:    Respondents are Italians and relatives, Onesto being the uncle of Damico.    They have resided in the city of Chicago for several years.    They left Chicago on the morning of July 31, 1916, in pursuance of an arrangement, which they had previously made in a saloon, to go to Benton Harbor.    They arrived there at about five o'clock in the afternoon.    They made inquiry of a real estate man in Benton Harbor where Pontorno lived.    Upon being advised they engaged a taxi and drove nearly to Pontorno's home in the country when they alighted and discharged the chauffeur, saying to him they would walk the rest of the way.    They soon changed their plans and returned to Benton Harbor because

of the suggestion of Onesto that they might not be well received by Pontorno at that hour of the day. From Benton Harbor they went to Coloma, a distance of six or seven miles from Pontorno's home, where they registered at a hotel under assumed names and spent the night. In the morning they arose and went directly to Pontorno's home. Upon arrival they did not find him there. They were well received by Pontorno's wife and by Pontorno when he returned. The three visited, looked about the farm and afterwards had dinner together. About 3:30 o'clock in the afternoon Pontorno hitched his team to a light wagon to return a mechanic, temporarily in his employ, to the interurban station. Pontorno invited the respondents to accompany him and they did so after some hesitation. In returning from the interurban station Damico rode in the seat beside Pontorno. Onesto occupied the rear seat alone. When nearing Pontorno's home, in a secluded point in the highway, Pontorno was shot and killed, one shot entering the back of his head, another the shoulder and a third passing through the heart. He was dragged for some distance through the grass, leaving a bloody trail, to a nearby orchard where he was found a few hours later. Respondents fled to Chicago where several months later they were apprehended and brought to Berrien county for trial.

The deceased was also an Italian, and appears to have formerly resided in Chicago. He and the respondents were well acquainted and had had business dealings. While in Chicago Pontorno was engaged in banking and in connection therewith ran a real estate business and a steamship ticket office. It appears that at one time Onesto, a relative, and Pontorno purchased certain real estate in Chicago for the price of $66,000. Pontorno had charge of it and collected the rents. Failing to account to his co-owners a suit was begun by Onesto to compel him to make an accounting,

and considerable bad feeling was engendered by this litigation, it being the claim of Onesto that Pontorno robbed him. Soon after the termination of the litigation, and in 1915, Onesto was shot by some unknown person, and it appears that Onesto charged Pontorno with either doing it himself or causing it to be done. Soon after this trouble Pontorno moved to Berrien county and purchased a farm a few miles from Benton Harbor, where he had since resided.

Before the trial was over the respondents took the stand and testified in their own behalf. Onesto admitted that he shot Pontorno but claimed that he did it in self defense. Onesto gave the details of the shooting and described what led up to it, as follows:

"On the way back (from the interurban station) he was showing us the different places and explaining things to us. After we had gone quite a ways we got to a big hill and he pointed towards his farm and said: 'Look at my farm there, I certainly have it real nice out here.' I then said to him: 'Yes, your farm out here is certainly wonderful, but you have left two of us fathers out in the street without any money (by us I meant my other nephew whose name is also Frank Damico, and myself).' And he said to me: 'Well, what do you want here? Did you come all the way out here to break my testicles? Wasn't it enough when I gave you one shot full in Chicago? Do you want another one here?'"

It was Onesto's claim that following this conversation Pontorno jumped to the ground and that he followed him and a struggle ensued in which he wrested Pontorno's gun from him and shot him three times. Damico testified that he took no part in it, and was corroborated by Onesto.

It was the theory of the people that the respondents conspired in Chicago to go to Benton Harbor and take the life of Pontorno, and that the motive therefor was to be found in their quarrels over business

dealings in Chicago as well as in the shooting of Ones-' to which, whether rightfully or wrongfully, he charged to Pontorno. After reviewing the testimony adduced at the trial, we are of the opinion that it was sufficient to furnish a foundation for the inferences of guilt which the State sought to draw from it. The trial court was in no error in submitting to the jury the question of respondents' guilt.

3 and 4. After deliberating several hours the jury were brought into court and the following colloquy took place:

"*The Court:* Gentlemen of the jury, I am advised that you have not yet agreed upon a verdict. Is there anything, any principle of law upon which the court can assist you?

"*A Juror:* No, I don't know as there is.

"*A Juror:* One thing I would like to speak to you about, the jury would like a little information. We understood in the charge to the jury that if we saw fit to find Frank Damico guilty that he would be equally guilty with Onesto? Is that right?

"*The Court:* Yes, I think so, under the instructions I gave you.

"*A Juror:* In your instructions, if we found him guilty of anything, he has got to be equally guilty with Onesto?

"*The Court:* Yes, I think that is correct under the facts, as I understand them in this case.

"*A Juror:* As I understand your charge, Judge, if we find Tony Onesto guilty, we will say of murder in the first degree or second degree, either one, that we had to find Frank Damico equally guilty.

"*The Court:* Oh, no.

"*The Juror:* Or discharge him?

"*The Court:* Or discharge him, that will do.

"*The Juror:* Either equally guilty or acquittal?

"*The Court:* I think that is correct, Mr. Foreman.

"*The Juror:* That is the point I want information on.

"*The Court:* I think that is correct, that is, under the facts in this case."

Error is assigned upon that part of the colloquy in which the court instructed the jury that in the event they found Damico guilty they should find him equally guilty with Onesto, or acquit him. It is hardly fair to the trial court to construe this language independently of the main charge. It was the people's theory that the respondents conspired to take the life of Pontorno and that they came to Benton Harbor and worked it out in accordance with the preconcerted plan. The people's case was put before the jury on this theory. They were instructed in the main charge that:

"The defendants are jointly charged with the murder of one Pontorno. The people claim that the two defendants, Onesto and Damico, came from Chicago with the intent and purpose of killing Pontorno, that they were acting together with a common intent, and on August 1st, 1916, Pontorno was murdered by them. * * *

"If the jury believe, beyond a reasonable doubt, from all the facts and circumstances in the case, that the two respondents acted with a common intent to kill Pontorno—acting with a common intent to kill Pontorno, came from Chicago, and Onesto killed Pontorno in carrying out such common intent, then Damico would be equally guilty with Onesto; but if Damico was not immediately present when Onesto killed Pontorno, had nothing to do with the killing, and had not been acting with Onesto with such common intent, then Damico would not be guilty. * * *

"If the jury believe, beyond a reasonable doubt, that the respondents were acting in concert with a common intent, as I have before stated, when Onesto killed Pontorno, and if you find Onesto guilty, then Damico is equally guilty.

"If, on the other hand, when Onesto killed Pontorno, he was acting in self-defense, under the suggestions as I have before stated, then both defendants are not guilty. In accordance as you determine what the evidence shows, one of three verdicts can be rendered by you; murder in the first degree; murder in the second degree; manslaughter or acquittal."

If Onesto did the shooting and Damico was present, aiding and assisting him in the commission of the crime, he would be equally guilty with Onesto. On the other hand, if he was not aiding and assisting Onesto in the commission of the crime, he was entitled to a verdict of acquittal. We see no room in the testimony for the jury to find that Damico was guilty of any other or different offense than Onesto was. Under the people's theory, if he were not guilty of the same offense Onesto was, he was entitled to a verdict of acquittal. Under Onesto's theory of self-defense Damico was entitled to a verdict of acquittal. Unless the proofs showed that the jury would have been justified in convicting Damico of an offense of lesser grade, there was no occasion for the court to instruct them in regard to it. *People* v. *Ezzo,* 104 Mich. 341; *People* v. *Repke,* 103 Mich. 459. We, therefore, conclude that the instruction was proper under the circumstances of this case.

5. Complaint is made because the court did not draw a distinction between second degree murder and manslaughter in reply to the request of a juror. The court, in his principal charge, defined, at some length, murder in the first and second degrees, also manslaughter, and later in reply to the request of the juror he defined manslaughter again, saying in part:

"*The Court:* I want to give it to you, as near as I can; just as I instructed you before. You understand, gentlemen, what murder in the first and second degree consists, I suppose, and that what you want is simply a definition of manslaughter? Now, manslaughter is the unlawful killing of another without malice, express or implied. The offense is one that is committed without malice or premeditation." * * *

There appears to be no merit in this contention.

6. The pantaloons worn by the deceased at the time he was killed was offered and received as an exhibit. Some time after the jury retired to consider their ver-

dict they advised the court through the attending officer that they desired to examine the pantaloons in the jury room. The court denied their request. It does not appear whether any objection was made by the State or for what reasons the trial court denied the request. The question whether exhibits admitted upon the trial shall be taken to the jury room is one of discretion with the trial court. *Eulen* v. *Granger,* 63 Mich. 311; *Tubbs* v. *Insurance Co.,* 84 Mich. 646; *Walker* v. *Newton,* 130 Mich. 576; *Farrell* v. *Haze,* 157 Mich. 374; *People* v. *Tibbetts,* 173 Mich. 628; *Silverstone* v. *Assurance Corporation,* 187 Mich. 333; *People* v. *LaLonde,* 197 Mich. 76.

We cannot say in this instance that the court abused his discretion inasmuch as the particular circumstances attending his refusal do not appear of record.

The trial of this cause was a long one in which both sides of the controversy were well presented. The instructions of the trial court were fair and impartial. Under these conditions the jury has done its duty and recorded its verdict. No reversible error having been pointed out in the proceedings, the judgment of conviction must be affirmed.

OSTRANDER, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.