PEOPLE *v* CARTER

PEOPLE *v* BROYLES

PEOPLE *v* McCULLY

OPINION OF THE COURT

1. SEARCHES AND SEIZURES—APARTMENT—SEARCH WARRANT—EVI-DENCE.

Warrantless search of an apartment was not required under the exigencies of the occasion where the police had determined that, even if felons had been in the apartment, they were no longer there; the police were in full control of the area and could have protected it from possible loss or destruction of evidence while securing a search warrant.

2. SEARCHES AND SEIZURES—AUTOMOBILES—PROBABLE CAUSE.

Warrantless search of a defendant's automobile, three days after it was seized and was in the possession of law enforcement authorities for that time, was illegal, since the officers lacked probable cause to search the automobile at the time they seized it where the record failed to connect the automobile with the crimes charged or with another crime.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 47 Am Jur, Searches and Seizures § 53.
[2] 47 Am Jur, Searches and Seizures §§ 18, 21.
[3] 29 Am Jur 2d, Evidence §§ 249, 251.
[4] 53 Am Jur, Trial §§ 471, 551 *et seq.*
[5] 53 Am Jur, Trial § 512 *et seq.*
[6] 53 Am Jur, Trial § 514.
[7] 29 Am Jur 2d, Evidence § 827.
[8] 40 Am Jur 2d, Homicide § 398.
[9] 29 Am Jur 2d, Evidence § 424.
[10] 40 Am Jur 2d, Homicide §§ 41, 54.
[11] 40 Am Jur 2d, Homicide § 41.
[12] 40 Am Jur 2d, Homicide § 54.
[13] 40 Am Jur 2d, Homicide § 70.
[14] 40 Am Jur 2d, Homicide § 72.
[15] 40 Am Jur 2d, Homicide § 50 *et seq.*
[16] 40 Am Jur 2d, Homicide § 13.
[17] 40 Am Jur 2d, Homicide § 563.
[18] 40 Am Jur 2d, Homicide § 76.
[19] 5 Am Jur 2d, Appeal and Error § 973.

3. CRIMINAL LAW—EVIDENCE—IRRELEVANT EVIDENCE—APPEAL AND ERROR—WEAPONS.

Testimony of a store owner that he was the owner of a gun and that it had disappeared, and testimony of the police that the disappearance had been reported, was erroneously admitted where the testimony was irrelevant as to any of the issues in a murder and kidnapping case and it was clearly prejudicial in spite of an effort by the prosecution to show merely that the gun had disappeared and the disappearance had been reported to the police.

4. CRIMINAL LAW — INSTRUCTIONS — PRESUMPTIONS — GUILT — INNOCENCE — APPEAL AND ERROR.

Trial judge erred in instructing the jury in a criminal case to the effect that the failure of the defendants to take the witness stand, "that fact standing alone," should not form a presumption either of guilt or innocence.

5. TRIAL—CRIMINAL LAW—CIVIL CASES—INSTRUCTIONS—REQUESTED INSTRUCTIONS.

Requested instructions adopted by the court in criminal or civil cases are the court's instructions, not requested instructions, and it is improper for the trial judge to state that they emanated from counsel.

6. CRIMINAL LAW—EVIDENCE—OTHER CRIMES—INSTRUCTIONS—FAILURE TO REQUEST—APPEAL AND ERROR.

Limiting instruction concerning a bank robbery should have been given, if requested, where none of the defendants were charged with bank robbery but evidence of that crime constituted a major part of the trial for murder and kidnapping; however, since there was no such request, there was no error in failing to give such an instruction.

7. CRIMINAL LAW—EVIDENCE—IRRELEVANT EVIDENCE—WITNESSES— BALLISTIC EXPERTS.

Testimony of ballistic experts with regard to a bullet that was fired into the floor of a bank, particularly since the experts could not link the battered bullet to the guns seized, was irrelevant and should have been excluded; it in no way tended to prove the crimes charged, murder and kndnapping, or to provide a necessary link between the defendants and the bank robbery.

8. HOMICIDE—CAUSE OF DEATH—REASONABLE DOUBT—PHYSICIANS AND SURGEONS—HYPOTHETICAL QUESTIONS—APPEAL AND ERROR.

There was no error in allowing a doctor to testify at a murder trial, in response to a hypothetical question, as to the cause

of death "beyond a reasonable doubt" where the claimed error was invited by an attorney for defendants; ordinarily a doctor should respond to a hypothetical question in terms of medical possibility or probability.

9. CRIMINAL LAW—EVIDENCE—SEARCHES AND SEIZURES—APARTMENT —JOINT TRIAL—APPEAL AND ERROR—INSTRUCTIONS.

It was error to hold that evidence seized in the apartments of two defendants and an automobile owned by one of them was admissible against all three defendants at a joint trial for murder and kidnapping, until such time as each one of them had been connected to that evidence, particularly in view of the fact that a separate trial had been requested and denied for the third defendant; limiting instructions should have been given when the evidence was presented, as well as in the judge's closing charge to the jury.

10. HOMICIDE—MURDER—MANSLAUGHTER—STATUTES.

Neither murder nor manslaughter is defined in the statutes pertaining thereto (1948 CL 750.316, 750.317, 750.321).

11. HOMICIDE—MURDER—MALICE—WORDS AND PHRASES.

Murder is an unlawful, malicious killing; if the killing results from an unlawful collateral act or attempt to commit a criminal offense, malice may be implied.

12. HOMICIDE — MANSLAUGHTER — INVOLUNTARY MANSLAUGHTER — VOLUNTARY MANSLAUGHTER — MALICE — PREMEDITATION — WORDS AND PHRASES.

Manslaughter is the unlawful killing of another without malice, express or implied; the offense is one that is committed without malice or premeditation; manslaughter is generally divided into two classes—involuntary or voluntary.

13. HOMICIDE—INVOLUNTARY MANSLAUGHTER—WORDS AND PHRASES.

Involuntary manslaughter consists of a killing without malice and unintentionally, but with an intent to inflict injury or a reckless disregard for the safety of the deceased.

14. HOMICIDE—MURDER—FELONY-MURDER—MALICE—STATUTES.

If there has been a killing during the commission of one of the felonies enumerated under first-degree murder, this establishes the degree; if the killing occurs during the commission of some other felony, malice may be implied but the nature of the felonious act must be considered (1948 CL 750.316).

15. HOMICIDE—MURDER—FELONY-MURDER—MALICE—JURY QUESTION.

To hold that in all cases it is murder if a killing occurs in the

commission of any felony would take from the jury the essential question of malice.

16. Homicide—Murder—Felony-Murder—Malice.

To constitute murder, even though malice may be implied from felonious acts, the killing must be attributable to the accused.

17. Criminal Law—Instructions—Lesser Included Offenses.

In a criminal case, if there is a request to charge as to a lesser included offense, but there is no evidence of such a lesser included offense, or the facts are such that the court or the jury would be obliged to conclude that the defendant was guilty of the offense charged or not guilty no charge as to a lesser included offense need be given; but if the evidence is subject to different interpretations that would justify a finding of a lesser offense, a charge as to such lesser offense, especially if one is requested, should be given.

18. Homicide — Murder — Manslaughter — Felony-Murder — Evidence — Circumstantial Evidence — Jury Question — Instructions.

Circumstantial evidence that none of the physical injuries the victim received would have contributed to his death and the conduct of defendants in opening the trunk of the victim's car in which the victim's body was later found were matters to be considered by the jury under a proper charge as to manslaughter, as well as first and second-degree murder where it was maintained that even though defendants were engaged in felonious acts, they did not act with malice, either express or implied and their conduct in opening the trunk of the car could be accounted for on the theory that they believed the victim to be alive and were giving him a chance to escape.

Dissenting Opinion
Black, J.

19. Appeal and Error.

*Perceiving no reversible error, convictions of two defendants of first-degree murder and kidnapping are affirmed and case of third defendant is remanded with instructions.*

Appeal from Court of Appeals, Division 3, Holbrook, P. J., and Bronson and Munro, JJ., affirming in part and remanding in part Kent, John H. Vander Wal, J. Submitted January 5, 1972. (No. 7 January

Term 1972, Docket Nos. 53,159–53,161.)    Decided
May 4, 1972.

28 Mich App 83 reversed.

Jeffrey Carter, Harry Broyles and Howard Mc-Cully were convicted of first-degree murder and kidnapping. Defendants appealed to the Court of Appeals. Affirmed as to Broyles and McCully, remanded with instructions as to Carter. Defendants appeal. Reversed, convictions vacated, and new trial ordered.

*Frank .J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *James K. Miller*, Prosecuting Attorney, and *Donald A. Johnston, III*, Chief Appellate Attorney, for the people.

*State Appellate Defender Office, Warner, Norcross & Judd* (by *John Tully*), *Varnum, Riddering, Wierengo & Christenson* (by *Carl R. Fleetwood*), and *Cholette, Perkins & Buchanan* (by *Sherman H. Cone*), for defendants.

ADAMS, J.

## I.

### *THE CRIME.*

December 1, 1967 was the last day in the life of Emile Osbeck, a 67-year-old self-employed interior decorator. He spent the morning working at his trade, ate a hearty lunch with his wife, and then went to a paint store where he purchased three gallons and four quarts of paint. He first carried the gallon cans, weighing approximately 15 pounds each, out of the store and then returned for the four

quarts. He was last seen alive at 12:50 p.m. carrying them out of the store.

Between 1:00 and 1:15 p.m., there was a robbery of a Grand Rapids bank. As the three robbers left the bank, the manager, Roger C. Williamson, followed them to the door. He saw them run across a drive to a parking space and get into a Ford car. He called out the license number and an employee of the bank wrote it down. It proved to be the license number of Emile Osbeck's automobile.

Shortly after the robbery, Osbeck's car was parked in a high school parking lot. Carole Huizenga, a student, saw three men get out of the car, open the trunk, and run off on foot toward a residential section. At about the same time, Gerald Vander Tuig, Director of a Child Guidance Clinic, was conversing with a friend outside the clinic. He observed three men enter a three-apartment building where defendants McCully and Broyles lived. At approximately 1:20 p.m., Richard Plaisure, a Junior College student, came into the high school parking lot with some tires to put into his brother's car. He saw a body in the open trunk of the parked Osbeck automobile and hastily summoned police officers from a nearby intersection. The police saw footprints, apparently made as the result of an overturned can of paint in the front seat of the car. The prints were far apart, indicating to the officer that whoever had made them was running. They led to the three-apartment building. Vander Tuig told the police officers what he had observed.

Mrs. McCully gave the officers permission to look through her apartment. The police did not find the suspects. They then went to the apartment belonging to Broyles where they saw a wet spot by the door, knocked, received no answer, and entered.

While searching the apartment for the criminals, they seized a pair of shoes smeared with still-wet white paint, a red hooded sweat shirt with a hole in the sleeve, and a brown paper sack containing $943 in bills. Having satisfied themselves that there was no one in the Broyles apartment, and upon the arrival of additional police officers, a further search was conducted. The police found a .22 caliber German revolver in a steel cabinet and $1,740 in bills, wrapped in a cloth, under a cushion of an overstuffed chair.

On December 1, 1967, Broyles and McCully were due at the Grand Rapids Hall of Justice at 1:30 p.m. to be sentenced on a previous conviction. They put in their appearance at 2:10 p.m. They asked Gilmore Welford to drive McCully's Buick car back to the McCully apartment. Welford was prevented from entering the McCully apartment by the police so he drove to a nearby poolroom. Shortly thereafter, the police took Welford into custody as a material witness and seized the McCully automobile.

Defendant Carter, a known friend of McCully and Broyles, was picked up at McCully's apartment by Carter's brother and sister-in-law shortly after 1:30 p.m. and taken to a cleaning establishment. A few days later he went to Flint, Michigan, where he spent a week. Upon his return, he was arrested on December 14, 1967, for another unrelated crime. He was held on that charge, which was later dismissed, until January 11, 1968, when he was charged in this case.

Dr. Gerald Barofsky, Medical Examiner for the County of Kent, was called to the high school parking lot at 1:30 p.m. and arrived at the scene at approximately 1:45 p.m. Dr. Barofsky was able to determine that Emile Osbeck had died within an

hour of his arrival. An autopsy disclosed that he had a small laceration on his left ear, a bruised area over the left cheek bone, and a bruised area in the scalp. In the doctor's opinion, death could not be attributed to any of these minor injuries. Osbeck had an enlarged heart. At the trial, Dr. Barofsky testified that, in his opinion, if Osbeck were placed in a trunk of a car, the lid of the trunk closed, the car driven for any distance, that, medically speaking, this would be sufficient to cause a cardiac arrest and death.

On December 2, 1967, the police returned to the apartment building with a search warrant. They seized from McCully's apartment $1,500, a .25 caliber pistol, and .22 caliber ammunition.

On December 4, 1967, three days after the Mc-Cully automobile had been impounded, the police, without a warrant, searched the car. They found several .22 and .25 caliber cartridges in the glove compartment.

At the conclusion of the ensuing trial of defendants, after the jury had begun its deliberations on a verdict, there was a request from it for a timetable of the tragic events of December 1, 1967. The attorneys went over a time schedule which the judge read to the jury as follows:

"11:30, three men go in McCully's car to Bi-Lo Market.

"12:00 o'clock Mr. Osbeck is home for lunch.

"Approximately 12:40 Mrs. Osbeck testified Mr. Osbeck left his home after lunch.

"12:30 to 12:35 Mr. Schindler from the paint store testified that Osbeck came into the store.

"12:50 Schindler testified that Osbeck left with four quarts of paint, that is the second batch of paint.

"1:15 is the bank robbery.

"1:15 to approximately 1:20 school girls at Christian High see the car come into the lot at Madison and Franklin or Prospect and Franklin.

"1:22 police arrive at car in the lot.

"1:20 to 1:25 Mr. Vander Tuig sees from the Child Guidance Home sees three men run into and enter 648 Prospect.

"1:40 is the first word over the TV broadcast that there was a body in the trunk.

"Approximately 1:40 to 1:55 Jeffrey Carter is at the cleaners at the corner of Division and Hall according to the testimony of Mrs. Bright.

"Approximately 1:40 to 1:50 Gilmore Welford was picked up by McCully and Broyles on Cottage Grove at Doehler Jarvis.

"Police arrive at the residence area of 648 Prospect around approximately 1:50 to 1:55 according to the testimony of Captain Pierce."

## II.

### *THE TRIAL.*

The defendants were charged 1) with first-degree felony murder committed in the course of a robbery of an automobile; 2) second-degree murder with no specification as to how committed; and 3) kidnapping.

The defendants' requests for separate trials were denied. The joint trial which resulted presented difficuties both for the prosecution and for the defense.

The people were faced with two main problems: 1) establishing the identity of the felons; and 2) establishing the cause of Osbeck's death.

As for McCully, they established that on the morning of the bank robbery, McCully, with two unidentified men, drove to downtown Grand Rapids at about 11:30; that the money found wrapped in a towel under the bathtub in the McCully apartment

came from the bank; and that a .25 caliber pistol and .22 caliber ammunition were found in his apartment.

Regarding Broyles, the people established that a red sweat shirt with a hole in it, similar to the one worn by one of the robbers, was found in his apartment; that shoes smeared with still-wet white paint were in the apartment; that money found in a bag in the attic came from the bank; and, finally, that a ten dollar bill found in Broyles' wallet, when his personal effects were inventoried after he was arrested at the Hall of Justice, was also part of the marked money coming from the bank.

As for Carter, the people introduced evidence of a somewhat equivocal statement made by him that could be interpreted as inculpating; that he was with McCully and Broyles, as well as with some other Negro men, until late the night before; that accounts of his whereabouts on the morning of December 1 were conflicting; that he was picked up by his brother and sister-in-law at McCully's apartment at 1:30 p.m. on December 1; that his response to the news of the crime, when his brother and sister-in-law took him to the cleaning establishment, could be interpreted as showing prior knowledge of it; that he went to Flint for a week shortly after the crime; and, finally, that, by process of elimination of other possibilities as to who else could have been with McCully and Broyles during the limited time, it must be deduced that the third party was Carter.

Concerning the cause of Osbeck's death, the people produced medical testimony to show that he had a moderately enlarged heart and could have died of natural causes at any time, but that a sudden cardiac arrest, absent a precipitating factor, would

be unlikely for a person of his age and condition. Such a precipitating factor could be fear when he was robbed of his car or when he was kidnapped and locked in the trunk. The three small lacerations on his body, too minor to have caused death, may have been caused by some physical force used to rob or kidnap him.

For the defense, the evidence against McCully and Broyles was so incriminating as to the bank robbery that their defense was concentrated primarily on the issue as to how Osbeck died. It was contended that Osbeck could have died at any time as a part of the normal aging process; that carrying the paint out of the store could have been the precipitating factor; that the external lacerations on his body may have been *post mortem* or as a result of his falling and hitting something; and that the actions of the defendants in opening the trunk of the car after the robbery totally contradicted any theory that they intended to cause his death.

As for Carter, there was no positive evidence showing that he was one of the bank robbers. Consequently, counsel for him emphasized throughout the trial the inability of any witness to link Carter to the bank robbery. Witnesses produced for Carter explained his presence in the company of McCully and Broyles before and after the commission of the crime as being a natural one in the Negro community. It also was brought out that Sam Brown, the third tenant in the apartment building, was first charged with the crime. The charge against him was later nolle prossed. As a result, it was necessary for the jury first to determine, based upon a much thinner thread of circumstan-

tial evidence, that he was the third bank robber, before considering the other possible defenses.[1]

The judge charged the jury on November 26, 1968, concluding his instructions before lunch. After a noon recess, the jury retired to deliberate. It returned at 3:30 p.m. and asked for a physical copy of definitions of the charge under Counts I, II and III. Instead, the court had the court reporter read back from the charge the definitions he had given of first-degree murder, second-degree murder, and kidnapping

The jury returned a second time to ask if Count II and Count III could be involved together. The court stated the answer was "yes," and went on as follows:

"And I instructed the Jury that if there was a death arising out of the kidnaping it would be second degree murder and so you would have,—if you found that to be evidence beyond a reasonable doubt, you would have the second count and you would have the third count. See before you could have an answer to the second count, you would have to find that there was a kidnaping, that is why they can be both involved together. I said that if there was a death resulting from the kidnaping it would be second degree murder, then so they are involved, and if you found the second count, if you found any of the respondents guilty of the second count it would follow that they would be guilty of the third count because you couldn't have the second count without a kidnaping so they are involved together, two and three. Okay."

An exception was taken to this subsequent charge.

The jury returned again at 5:15 p.m. with this question: "Can charge number two be considered

<hr>

[1] See *People* v *Fleish*, 321 Mich 443 (1948), where the successful defense of defendant Mahoney is similar to that interposed here for defendant Carter.

as a verdict if we agree that robbery is involved?"
The court responded as follows:

"The answer to that question is yes providing you
find that the death resulted from the kidnaping and
not from the robbery. In other words in order for
there to be first degree murder, death would have to
result from the robbery. Second degree murder
would have to arise out of the kidnaping but it is
consistent with the testimony, to your question I
have to say yes because there could be a robbery and
the death could be the result of the kidnaping and
not the robbery, so if I say yes to that question then
it would be providing that the death resulted from
the kidnaping, not the robbery."

It will be seen that, as a result of the various
charges by the judge to the jury, it was restricted to
four possible verdicts: 1) first-degree murder aris-
ing out of a robbery; 2) second-degree murder aris-
ing out of a kidnapping; 3) kidnapping; and 4) not
guilty.

The trial judge had ruled in a conference in cham-
bers that he would not give a charge on manslaugh-
ter. After he concluded his charge to the jury, one
objection made to it was his failure to charge as to
manslaughter.

The jury returned at 10:25 p.m. and announced
that it had reached a verdict as to two of the defend-
ants. It found defendants Broyles and McCully
guilty on Counts I and III.

The jury was locked up for the night. It resumed
its deliberations the following morning, and at 11:20
a.m. brought in a verdict finding defendant Carter
guilty on Counts I and III.

Defendants appealed. The convictions of Broyles
and McCully were affirmed by a panel of the Court
of Appeals, Judge BRONSON dissenting. (28 Mich
App 83.) Carter's case was remanded for an eviden-

tiary hearing to determine whether an exculpatory
statement by Broyles concerning Carter was essen-
tial to a proper preparation of Carter's case. If the
failure by the prosecutor timely to proffer this state-
ment to Carter's counsel was prejudicial, a new trial
should be given.

We granted leave to appeal to all three defendants.
(384 Mich 802.)

## III.

### REVIEW ON APPEAL TO THE COURT OF APPEALS AND TO THIS COURT.

Of the 18 issues raised in the Court of Appeals,
that Court in its majority and minority opinions
passed upon seven. It held that the others were
without merit and need not be discussed. We will
first consider those issues which were passed upon by
the Court of Appeals insofar as it is necessary to do
so in view of our disposition of this case. We will
then consider such further issues as are necessary to
discuss in view of our decision that the convictions
of the defendants are vacated and a new trial or new
trials, in the discretion of the trial judge, are or-
dered.

(a) Was it error to admit into evidence items
seized by the police, without a warrant, while search-
ing defendants' apartment in pursuit of suspected
felons after it was determined that there were no
persons in the apartment?

The Court of Appeals correctly concluded that
items seized while no longer in hot pursuit of the
criminals were erroneously admitted into evidence.
The police had determined that, even if the felons
had been in the apartment, they were no longer there.
The police were in full control of the area and could
have protected it from possible loss or destruction

of evidence while securing a search warrant. The exigencies of the occasion were no longer such as to require a warrantless search. *Warden, Maryland Penitentiary* v *Hayden,* 387 US 294; 87 S Ct 1642; 18 L Ed 2d 782 (1967); *Terry* v *Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968); *People* v *Kaigler,* 368 Mich 281 (1962).

(b) Was the ammunition found in McCully's car admissible?

The majority of the Court of Appeals found that under *Chambers* v *Maroney,* 399 US 42; 90 S Ct 1975; 26 L Ed 2d 419 (1970), a new interpretation is to be given to the Fourth Amendment in regard to searches of automobiles, but concluded that, even under *Chambers,* a three-day wait before performing a warrantless search could not be upheld, particularly where the vehicle has been in the possession of law enforcement authorities for three days.

As pointed out by Judge BRONSON, the record in this case, unlike the situation in *Chambers* where the defendants had committed a felony and were fleeing in a particular car, fails to connect the McCully automobile with the crimes charged or with the bank robbery. Since the officers lacked probable cause to search the automobile at the time they seized it, the warrantless search at a later time was illegal. *People* v *Carr,* 370 Mich 251 (1963).

(c) Did the trial court err by admitting into evidence testimony which tended to show that defendant McCully had obtained a pistol in a previous unconnected theft?

A .25 caliber pistol was found in McCully's apartment on December 2, 1967, pursuant to a lawful search with a warrant. The testimony of a store owner that he was the owner of the gun and that it had disappeared, and the testimony of the police that the disappearance had been reported, as held by

the Court of Appeals, was erroneously admitted. The testimony was irrelevant as to any of the issues in this case. It was clearly prejudicial in spite of an effort by the prosecution to show merely that the gun had disappeared and the disappearance had been reported to the police. *People* v *Greenway,* 365 Mich 547 (1962).

(d) Did the trial judge err in instructing the jury to the effect that the failure of the defendants to take the witness stand, "that fact standing alone," should not form a presumption either of guilt or of innocence?

This statement by the judge appears to have been inadvertent on his part. We are satisfied that this error will not be repeated. See, *People* v *Mitchell,* 164 Mich 583 (1911).

(e) Did the trial judge err in stating that an instruction was requested by defense counsel?

Again, we regard the statement by the judge as an inadvertent aside which will not be repeated. As was said in *People* v *Hunter,* 370 Mich 262, 267 (footnote) (1963):

"We note, in passing, the trial judge's labeling of the requested instructions given to the jury as emanating from the prosecutor. We have had occasion recently to indicate our disapproval of this improper practice in civil cases. See *Reetz* v. *Rigg,* 367 Mich 35 [1962], relying upon *Newton* v. *Consolidated Construction Co.,* 184 Mich 63 [1915]. It is no less improper in criminal cases. When requested instructions are adopted by the court, they are the court's instructions,—not requested instructions."

(f) Was the evidence concerning the bank robbery properly admissible and, if so, should a limiting instruction have been given concerning this testimony?

None of the defendants were charged with bank robbery. Evidence concerning this crime constituted a major part of the trial. Clearly, the testimony of the bank manager, of the tellers, and of Mrs. Mary Anthon who was waiting to make a deposit at a drive-in window, was an essential part of the people's case. Without the testimony of the bank manager with regard to the license number of the Osbeck automobile, the testimony of these witnesses with regard to the size of the criminals, what clothing they were wearing, what they did, and anything else they were able to state that would tend to go to the identification of them, the transaction involving the theft of the Osbeck car could not have been meaningfully presented to the jury. If a limiting instruction concerning the bank robbery had been requested, one should have been given. *People* v *Seaton,* 235 Mich 698 (1926); *People* v *Rice,* 206 Mich 644 (1919). Since there was no such request, there was no error in failing to give such an instruction. On the other hand, much of the testimony of the FBI ballistic experts with regard to a bullet that was fired into the floor of the bank, particularly since the experts could not link the battered bullet to the guns seized, was irrelevant and should have been excluded. It in no way tended to prove the crimes charged or to provide a necessary link between the defendants and the bank robbery.

(g) Was there reversible error in allowing a doctor to testify (in response to a hypothetical question) as to the cause of death "beyond a reasonable doubt", this being the ultimate question for the jury to decide?

This claimed error was invited by one of the attorneys for defendants who first objected to the form of the medical hypothetical question. He stated: "I think the form of the question to a reasonably

medical certainty falls far short of beyond a reasonable doubt criteria, which the prosecution is required to present to the Jury." When the prosecutor then attempted to clear up the reasonable doubt issue, the defense objected to that question. While ordinarily a doctor should respond to a hypothetical question in terms of medical possibility or probability,[2] there was no error here. See GCR 1963, 605.

(h) Could the evidence seized in the McCully apartment and automobile and the Broyles apartment, if otherwise admissible, be used against all three defendants?

As already noted, the attorney for defendant Carter took great care to establish the fact that there was no positive identification of Carter as a participant in the bank robbery. Carter's entire defense was based on the failure of the people to identify him as a participant. To hold that the evidence seized was admissible against all three defendants, until such time as each one of them had been connected to that evidence, was error, particularly in view of the fact that a separate trial had been requested for Carter and denied. Limiting instructions should have been given when the evidence was presented, as well as in the judge's closing charge to the jury. See, *People* v *Campbell,* 301 Mich 670 (1942).

(i) What constitutes "murder"?

(j) Does second-degree murder include death occurring during felonies other than those mentioned in the first-degree murder statute, *i.e.,* kidnapping?

(k) Did the court err in failing to instruct the jury with respect to manslaughter?

These three questions will be considered together.

1948 CL 750.316; MSA 28.548, at the time of the offense here charged, read as follows:

---

[2] *Yates* v *Wenk,* 363 Mich 311 (1961).

"First degree murder—*All murder* which shall be *perpetrated* by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be *committed* in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary, shall be murder of the first degree, and shall be punished by solitary confinement at hard labor in the state prison for life." (Emphasis added.)

1948 CL 750.317; MSA 28.549, provides:

"Second degree murder—All other kinds of murder shall be murder of the second degree, and shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same."

1948 CL 750.321; MSA 28.553, provides:

"Manslaughter—Any person who shall commit the crime of manslaughter shall be guilty of a felony punishable by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars, or both, at the discretion of the court."

Neither murder nor manslaughter is defined in the statutes.

In the case of *People* v *Potter,* 5 Mich 1, 6, 7, 9 (1858), Chief Justice MARTIN wrote:

*"Murder is where a person* of sound memory and discretion *unlawfully kills* any reasonable creature in being, in the peace of the state, *with malice* prepense or aforethought, *either express or implied.* This, the common law definition, is still retained in our statute. It speaks of the offense as one already ascertained and defined, and divides it into degrees, by providing that *all murder.* which shall be perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated *killing,* or *which shall be committed* in the perpetration, or attempt to perpetrate, any arson, rape,

robbery, or burglary, shall be deemed murder in the
first degree; and that all other kinds of murder shall
be deemed murder in the second degree; and requires
the jury, in case of a trial, to find, by their verdict,
the degree of the crime; and the court, in case of a
confession of guilt, to ascertain the same from evi-
dence.

\* \* \*

"Now, at common law, if a mortal blow was mali-
cious, although not given with intent to kill, or *if
death ensued from an act accompanying an unlawful
collateral act,* or under circumstances which showed
general malice, such as a reckless disregard of the
safety or lives of others, *the killing* would be murder,
and would be punishable in the same manner as
though perpetrated with the deliberate design of
taking the life of the victim.

\* \* \*

"Now, it is true, as charged, that if *the act of kill-
ing* was proved, the presumption of law is that it was
done with malice aforethought; but this rule only
obtains where there is an entire absence of qualify-
ing or explanatory evidence involved in, or deducible
from, the manner of *the killing.*  But, *malice afore-
thought is as much an essential ingredient of murder
in the second degree, as in that of the first.*  Without
this, *the killing* would be only manslaughter, if crim-
inal at all.  Now, malice aforethought is either ex-
press or implied, and there can be no case of murder
in the first degree, except when committed in the per-
petration, or attempt to perpetrate, arson, rape, rob-
bery, burglary, or robbery, when there does not exist
*express* malice; while, in case of murder in the
second degree, the malice is generally, if not univer-
sally, *implied.*"  (Emphasis by Chief Justice MARTIN
as to the words "express" and "implied" just before
and after the last semi-colon; otherwise, emphasis
added.)

In the case of *People* v *Scott,* 6 Mich 287 (1859),
it was contended that the trial judge erred in charg-
ing the jury as to what constituted first- and second-
degree murder.   Mr. Justice CAMPBELL wrote (pp
292–294):

" * * * As the questions presented seem to be
founded on a misapprehension of the views ex-
pressed by this court in the case of *The People* v.
*Potter,* 5 Mich 6, we deem it proper to repeat the ex-
planations given on that occasion, and to define the
different degrees of murder under our statute.

"*Murder at the common law, embraced all unlaw-
ful killing done with malice aforethought.   Murder
under our statute embraces every offense which
would have been murder at common law, and it em-
braces no other crime.*   But murder is not always
attended with the same degree of wicked design, or,
to speak more accurately, with the same degree of
malice.   It may be committed in cold blood, and with
much calculation, and it may be committed on a sud-
den impulse of passion, where the intent is formed
and executed in the heat of blood, without any suffi-
cient provocation to extenuate the degree of the
offense to manslaughter.   In both of these instances,
and in the intermediate cases where the design is of
greater or less duration, there is the actual intent
to take life.   *Other cases exist, where, in the attempt
to commit some other offense which is malum in se*
and not merely *malum prohibitum, human life is
taken without an express design to take it,* and yet
the crime is held to be murder, because resulting
from the same species of depravity or maliciousness
which characterizes that offense when committed
designedly.

"The statute, recognizing the propriety of con-
tinuing to embrace within the same class *all cases of
malicious killing,* has, nevertheless, divided these
offenses into different grades for the purposes of
punishment, visiting those which manifest deep
malignity with the heaviest penalties known to our

law, and punishing all the rest according to a sliding scale, reaching, in the discretion of the court, from a very moderate imprisonment to nearly the same degree of severity prescribed for those convicted of murder in the first degree. *Each grade of murder embraces some cases where there is a direct intent to take life, and each grade also embraces offenses where the direct intent was to commit some other crime.* As the law names all of the offenses, an attempt to commit which renders *the person who takes life* guilty of murder in the first degree, no difficulty can arise in defining the degree of any murder committed, without the actual design either of taking life or of doing bodily harm to the person assailed.

*"Except in the cases expressly named in the statute, murder in the first degree requires the existence of a deliberate intention to take life; and any slaying in which a jury should find either the absence of deliberation, or that the intent was to commit another and a lesser injury, must be either murder in the second degree, or one of the lighter grades of homicide."* (Emphasis added.)

As can be seen from these cases, murder is an unlawful, malicious killing. If the killing results from an unlawful collateral act or an attempt to commit a criminal offense, malice may be implied.

Manslaughter is generally divided into two classes —involuntary or voluntary. In *People v Onesto,* 203 Mich 490, 496 (1918), this Court approved the following definition of manslaughter:

" 'Now, manslaughter is the unlawful killing of another without malice, express or implied. The offense is one that is committed without malice or premeditation.' "

Involuntary manslaughter has been defined as " 'the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or

great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty.'" *People* v *Ryczek,* 224 Mich 106, 110 (1923); *People* v *Wardell,* 291 Mich 276 (1939).

In *People* v *Pavlic,* 227 Mich 562 (1924), the defendant was convicted of involuntary manslaughter. On appeal, it was contended that death from drinking moonshine furnished by the defendant was a felony murder, not manslaughter. This Court held that since the crime of selling intoxicating liquor was such by statute and therefore only *malum prohibitum,* manslaughter was properly charged but that the conviction could be sustained only if there was "an intent to inflict injury or a reckless disregard for the safety of the deceased."

Involuntary manslaughter consists of a killing "without malice and unintentionally," but with "an intent to inflict injury or a reckless disregard for the safety of the deceased."

Does it follow from the previously considered cases that whenever a person commits or attempts to commit a felony *malum in se,* not enumerated under first-degree murder and, in so acting, causes the death of another person, the law supplies the essential element of malice and the killing will be held to constitute second-degree murder? Could the death, depending upon the circumstances, be held to constitute manslaughter? Might it be held, as the Court observed on the facts in *Pavlic* (p 568): "The record is barren of any evidence that would convert the unlawful act of the defendant into the crime of manslaughter."?

In the case of *People* v *Treichel,* 229 Mich 303 (1924), an old man was tied to a bedstead and a robbery was committed. The victim was found dead some days later. The trial judge charged the

jury with regard to first- and second-degree murder and manslaughter. There was an appeal in which it was contended that the judge should have charged only as to first-degree murder. This Court said (p 308):

"Conceding the verdict might have been for murder in the first degree, because death was occasioned by act committed in the perpetration of a burglary, was such a verdict the only one permissible? We cannot so hold. We think the evidence left the question of degree and *the included crime of manslaughter* to the jury and the court avoided instead of committed error in so submitting it." (Emphasis added.)

In the somewhat similar case of *People* v *Andrus,* 331 Mich 535 (1951), the victim was also found bound. He died as a result of severe wounds inflicted during a burglary of his store. The trial judge charged with regard to first-degree murder, second-degree murder, and manslaughter. Again, on appeal, it was claimed that it was error to charge manslaughter on the facts of the case. This Court, commenting on the decision in *Treichel,* said (p 544):

"Conceding that the verdict might have been guilty of murder in the first degree because committed in the perpetration of a burglary, *the Court declined to hold that such verdict was the only one permissible.* Attention was directed to testimony indicating that defendants did not make their attack on their victim with the intention of killing him, and did not anticipate that such result would follow. As in the case at bar, the proofs indicated a purpose to prevent interference with the contemplated search for money. Clearly, had defendants intended to kill Frank Cline they would not have resorted to tying his hands and feet with the clothesline which English had taken into the store. The record indicates that

in charging the jury as stated the trial judge followed the decision in the *Treichel Case.* In view of the analogous situation presented there, he was justified in doing so." (Emphasis added.)

In the case of *People* v *Austin,* 221 Mich 635 (1923), the victim died from carbolic acid poison. The defense requested a charge of manslaughter. It was refused. Even though the death was shown to be from poison, this Court held that the issue raised by the defense as to whether the defendant had *intended* to kill the deceased by poison was a proper one and that, without such intent, the defendant could not be found guilty of murder. The case was sent back for a new trial for failure of the judge to charge as to manslaughter. This Court said (p 644):

"Homicide is the killing of a human being by a human being. It may, or may not, be felonious. If felonious, it is either murder or manslaughter, dependent upon the facts and circumstances surrounding the killing. To constitute murder, the killing must have been perpetrated with malice aforethought, either express or implied."

In *People* v *Marshall,* 366 Mich 498 (1962), the deceased died 'as the result of stab wounds inflicted by the defendant, a prostitute, who had gotten into a struggle with him as she attempted to leave his car. The defendant was convicted of manslaughter. However, this Court held that it was reversible error to allow the case to go to the jury on charges of first- and second-degree murder since there was no proof of malice.

In *People* v *Hansen,* 368 Mich 344, 350 (1962), it is said:

"Malice requires an intent to cause the very harm that results or some harm of the same general na-

ture, or an act done in wanton or wilful disregard of the plain and strong likelihood that some such harm will result."

Both murder and manslaughter deal with the wrongful killing of another person. If there has been a killing during the commission of one of the felonies enumerated under first-degree murder, this establishes the degree. If the killing occurs during the commission of some other felony, malice may be implied but the nature of the felonious act must be considered. Many felonies are not inherently dangerous to human life. To hold that in all cases it is murder if a killing occurs in the commission of any felony would take from the jury the essential question of malice.

Finally, to constitute murder, even though malice may be implied from felonious acts, the killing must be attributable to the accused. So, in *People* v *Austin,* 370 Mich 12 (1963), the killing of one of three robbers by the victim of the attempted robbery was held to be justifiable homicide. It was not a killing committed by the felons.

In a criminal case, if there is a request to charge as to a lesser included offense, but there is no evidence of such a lesser included offense, or the facts are such that the court or the jury would be obliged to conclude that the defendant was guilty of the offense charged or not guilty, no charge as to a lesser included offense need be given.[3]

But if the evidence is subject to different interpretations that would justify a finding of a lesser

[3] *People* v *Repke,* 103 Mich 459 (1895); *People* v *Nunn,* 120 Mich 530 (1899); *People* v *Onesto,* 203 Mich 490 (1918); *People* v *Utter,* 217 Mich 74 (1921); *People* v *Netzel,* 295 Mich 353 (1940); *People* v *Hearn,* 354 Mich 468 (1958); *People* v *Dupuis,* 371 Mich 395 (1963).

offense, a charge as to such lesser offense, especially if one is requested, should be given.[4]

In this case, it is maintained that, even though the criminals were engaged in felonious acts, they did not act with malice, either express or implied. The evidence is that none of the physical injuries Osbeck received would have contributed to his death. The conduct of the felons in opening the trunk of Osbeck's car after the bank robbery can be accounted for on the theory that they believed him to be alive and were giving him a chance to escape. Since all of the evidence is circumstantial, these were matters to be considered by the jury under a proper charge as to manslaughter, as well as first and second-degree murder.

Although the panel of the Court of Appeals found error as to the matters discussed under subparagraphs (a) through (c) of heading III of this opinion, a majority held that the errors were harmless. Since we find reversible error, we do not consider whether the errors noted by the Court of Appeals were harmless.

The Court of Appeals is reversed. The convictions of the defendants are vacated and a new trial or new trials, in the discretion of the trial judge, are ordered.

T. M. KAVANAGH, C. J., and T. E. BRENNAN, T. G. KAVANAGH, SWAINSON and WILLIAMS, JJ., concurred with ADAMS, J.

BLACK, J. (*dissenting*). With Division 3 (28 Mich App 83) I perceive no reversible error and therefore vote to affirm.

---

[4] *Baker* v *People*, 40 Mich 411 (1879); *People* v *Prague*, 72 Mich 178 (1888); *People* v *Droste*, 160 Mich 66 (1910); *People* v *Austin*, 221 Mich 635 (1923); *People* v *Treichel*, 229 Mich 303 (1924); *People* v *Andrus*, 331 Mich 535 (1951); *People* v *Milhem*, 350 Mich 497 (1957).