PEOPLE v TOWNES

Opinion of the Court

1. Criminal Law—Instructions—Objection—Appeal and Error—
Supreme Court—Supervisory Control Over Litigation—
Saving Question for Review.

Normally, the Michigan Supreme Court will not reverse a convic-
tion on the basis of errors found in the jury instructions unless
an objection to the erroneous portion of the instruction was
raised at trial; nevertheless, the Supreme Court, in the exercise
of supervisory control over all litigation, has often asserted the
right to consider manifest and serious errors although objection
was not made by the party who appeals, since the inherent
power of the Supreme Court to prevent fundamental injustice
is not limited by what appellant is entitled to as a matter of
right.

2. Homicide—Second-Degree Murder—Manslaughter—Volun-
tary Manslaughter—Involuntary Manslaughter—Instruc-
tions—Appeal and Error—New Trial.

Fundamental errors were present in the unobjected to jury
instructions and necessitate granting a new trial to a defendant
convicted of second-degree murder where the trial court was

References for Points in Headnotes
[1] 53 Am Jur, Trial §§ 135, 136.
   5 Am Jur 2d, Appeal and Error § 553.
[2, 3] 40 Am Jur 2d, Homicide §§ 53, 55, 555 et seq.
   Absence of evidence supporting charge of lesser degree of homicide
      as affecting duty of court to instruct as to, or right of jury to
      convict of, lesser degree, 102 ALR 1025.
[4] 40 Am Jur 2d, Homicide §§ 42, 54.
[5, 6, 9] 40 Am Jur 2d, Homicide §§ 247, 438, 500.
[7, 8] 40 Am Jur 2d, Homicide § 575.
[10] 40 Am Jur 2d, Homicide § 92.
[11, 18] 40 Am Jur 2d, Homicide §§ 519–521.
[12] 40 Am Jur 2d, Homicide §§ 487, 510, 512.
[13, 14, 16] 40 Am Jur 2d, Homicide §§ 575, 580.
[15] 40 Am Jur 2d, Homicide §§ 527, 528.
[17] 40 Am Jur 2d, Homicide §§ 139, 140, 151–159.

obviously confused about the law of manslaughter; the court at first delivered an undifferentiated manslaughter charge that consisted of the elements of both voluntary and involuntary manslaughter; the court's confusion was apparently transmitted to the jury; shortly after the jury retired it requested additional instructions clarifying the difference between second-degree murder and manslaughter; and in the supplemental instructions it defined manslaughter only in terms of the elements of involuntary manslaughter and omitted a charge on the more applicable offense of voluntary manslaughter.

3. HOMICIDE—VOLUNTARY MANSLAUGHTER—SECOND-DEGREE MURDER
—INSTRUCTIONS—APPEAL AND ERROR.

Trial court erred by not providing the jury with a reasonable understanding of the nature of the offenses over which it specifically charged the jury to deliberate where it is doubtful that the jury appreciated the severity, or even understood the existence of the offense of voluntary manslaughter and had little reasonable choice under the instructions but to return a verdict of second-degree murder, as it did; the court, in effect, removed voluntary manslaughter from the jury's consideration.

4. HOMICIDE—MANSLAUGHTER—STATUTES—WORDS AND PHRASES—
COMMON LAW.

Manslaughter encompasses several distinct modes of conduct not defined by statute and in Michigan the statutory provision on manslaughter prescribes only the penalty for the crime leaving the definition to be found at common law (MCLA 750.321).

5. HOMICIDE—MANSLAUGHTER—VOLUNTARY MANSLAUGHTER—INVOL-
UNTARY MANSLAUGHTER—COMMON LAW—MURDER—MALICE.

At common law manslaughter is divided into two general categories—voluntary and involuntary manslaughter; both categories of the offense proscribe the unlawful killing of another without legal justification or excuse and are distinguished from the higher crimes of murder by the absence of malice; beyond these similar elements, however, voluntary and involuntary manslaughter are distinct and separate offenses.

6. HOMICIDE—VOLUNTARY MANSLAUGHTER—PROVOCATION—PASSION—
MURDER—MALICE.

Voluntary manslaughter requires that a defendant be found to have an intent to kill or an intent to do serious bodily harm to the deceased and to this extent the offense parallels the crime of murder but it is distinguished from murder by an absence of malice; to reduce a homicide to voluntary manslaughter the

fact finder must determine from an examination of all the circumstances surrounding the killing that malice was negated by provocation and the homicide committed in the heat of passion.

7. HOMICIDE—PASSION—VOLUNTARY MANSLAUGHTER.

The word "passion" in the context of voluntary manslaughter describes a state of mind incapable of cool reflection.

8. HOMICIDE—VOLUNTARY MANSLAUGHTER—PROVOCATION—DELIBERATION—MURDER.

A defendant properly convicted of voluntary manslaughter is a person who has acted out of a temporary excitement induced by an adequate provocation and not from the deliberation and reflection that makes the crime of murder.

9. HOMICIDE—INVOLUNTARY MANSLAUGHTER—MALICE—INTENT—NEGLIGENCE.

Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty.

10. HOMICIDE—NEGLIGENCE—INVOLUNTARY MANSLAUGHTER—ORDINARY NEGLIGENCE—CRIMINAL NEGLIGENCE—GROSS NEGLIGENCE.

The negligence required to establish involuntary manslaughter is different in kind from ordinary negligence and such negligence is variously referred to as "criminal negligence" or "gross negligence".

11. CRIMINAL LAW—INSTRUCTIONS—SELF-DEFENSE.

Trial judge properly included a charge on self-defense in the jury instructions where defendant's testimony placed in issue the defense of self-defense.

12. TRIAL—INSTRUCTIONS—SUPREME COURT.

Michigan Supreme Court is required to review an instruction under the assumption that the jury followed it in reaching its verdict.

13. HOMICIDE—SECOND-DEGREE MURDER—AGGRESSOR—SELF-DEFENSE —INSTRUCTIONS—EVIDENCE.

A defendant may only be held legally accountable as an aggressor for responsive conduct by another that is reasonably attributable to defendant's own conduct; thus, in a case where the defendant was convicted of second-degree murder, trial court

erred when it erroneously assumed that if defendant was at
fault in provoking a disturbance in the deceased's store he
could then be held legally accountable as an aggressor for any
response to his conduct where there was no evidence that
would support the inferences created by a self-defense instruc-
tion that deceased's actions were a legally reasonable response
to defendant's conduct and therefore, that defendant was an
"aggressor" with respect to deceased.

14. HOMICIDE—SECOND-DEGREE MURDER—THREAT TO PROPERTY—
    PROVOCATION—AGGRESSOR.
    A threat to property is not a legally sufficient provocation to
    render defendant an aggressor in a case in which defendant
    was convicted of second-degree murder where the singular
    purpose underlying deceased's intervention into the confronta-
    tion between defendant and another was deceased's desire to
    avoid a disruption in his store.

15. CRIMINAL LAW—INSTRUCTIONS—APPEAL AND ERROR—PREJUDICE.
    The rule is well settled in Michigan that, in a criminal case, if an
    erroneous instruction is given on a material matter and the
    error is not corrected, such error must be regarded as prejudi-
    cial.

SEPARATE OPINION

WILLIAMS and M. S. COLEMAN, JJ.
See headnotes 2 and 3.

16. HOMICIDE—EVIDENCE—TESTIMONY—AGGRESSOR.
    *Introduction of testimony, that after defendant backed out of a
    store, deceased placed a gun in a holster he was wearing,
    turned and started to walk to the inner part of the store when
    defendant then suddenly reentered the store and began shoot-
    ing at deceased, fatally wounding him, did constitute evidence
    from which the jury might reasonably infer that defendant was
    the "aggressor" in his confrontation with deceased.*

17. CRIMINAL LAW—SELF-DEFENSE—NECESSITY.
    *The right of self-defense commences and ceases when real or
    apparent necessity begins and ends.*

18. CRIMINAL LAW—INSTRUCTIONS—SELF-DEFENSE.
    *Trial court instruction on self-defense, while far from a model of
    clarity, was based on a proper theory of law; however, it should
    have been only one of two instructions, the other based on a
    different interpretation of the facts, so that the jury would have*

*had a proper instruction of law for the fact situation they deemed to be the true one.*

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and Fitzgerald and Van Valkenburg, JJ., affirming Recorder's Court of Detroit, Frank G. Schemanske, J. Submitted December 5, 1973. (No. 7 December Term 1973, Docket No. 54,644.) Decided May 21, 1974.

44 Mich App 383 reversed.

Charles L. Townes was convicted of second-degree murder. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Robert A. Reuther,* Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Judith K. Munger),* for defendant on appeal.

SWAINSON, J. On August 2, 1972, appellant Charles Leslie Townes entered deceased Jessie Burnett's tire store in the City of Detroit. Appellant proceeded directly to an employee named Odom McMillion and began to loudly accuse McMillion of dating his wife. McMillion replied that he did not know what defendant was referring to and wanted to have no trouble with him.

Shortly after the verbal confrontation began, Jessie Burnett intervened and ordered appellant to leave the store. Burnett added that if the men had

any desire to continue their argument they should do so outside of his store.

When appellant refused to leave, Burnett went into his office and obtained a pistol. He returned with the gun at his side and without pointing it at appellant, again ordered him to leave. Appellant protested Burnett's action but soon raised his hands and backed out of the store followed by Burnett.

The trial testimony diverges at this point. All of the prosecution's witnesses generally testified that after appellant backed out of the store, Burnett placed the gun in a holster he was wearing, turned and started to walk to the inner part of the store. Appellant then suddenly reentered the store and began shooting at Burnett, fatally wounding him.

Appellant stated a markedly different version of the fatal shooting. He testified that he was very frightened when Burnett confronted him with the gun and remained in fear as Burnett holstered the gun but kept his hand on it. While the men were still facing each other Burnett made a "very sudden motion" that appeared to appellant to be an effort to draw the gun back out of the holster. Appellant stated that he then instantaneously reacted by reaching for a gun he carried in his belt and shot Burnett in what he believed was self-defense.

After the trial testimony was completed, the court instructed the jury on murder in the second degree, manslaughter and self-defense. The court, defining manslaughter, stated:

"Now the next offense, members of the Jury is known as manslaughter. Manslaughter is the unlawful killing of one human being by another. It may be an intentional killing. The killer may intend to kill the deceased but is brought about by provocation that is, the killer

may be excessively provoked and as a result of such provocation and while under its spell the accused kills the deceased. The killing must be not only under great provocation in order to reduce the gravity of the offense to manslaughter, but it must have been done while still in the heat of passion and before passions have had time to subside and the blood to cool. It must be done not only under great provocation, but under the influence of passion, but before the passions have had time to subside and reason to resume its normal course.

"Now in manslaughter, members of the Jury, the elements which make up the crime of manslaughter are as follows: the killing of another without legal justification; two, there need be no intention to kill; three, there need of—there need be no malice; fourth, there must be an unlawful act by accused; five, death must be the direct consequence of such unlawful act."

The court gave the following instructions on self-defense:

"Now the Defense in this case, members of the Jury, is a defense of self-defense, and I charge you, members of the Jury, first an aggressor is not necessarily a person who strikes the first blow in a personal encounter, or makes the first demonstration indicating an intent to strike. But if a person with a malice and hatred in his heart towards such a person seeks to provoke a difficulty either by acts or words with the intent to induce such other person to strike the first blow, or to make the demonstration in order to form a pretext to take his life, then the Defendant could not avail himself of the right of self-defense. If the defense —Defendant was the aggressor in the conflict, he cannot invoke the doctrine of self-defense as an excuse of the killing *unless* he was at that time in immediate danger of losing his own life, or suffering some grievous bodily injury and that there was no retreat for safety open for him, and his only safety lay in shooting the deceased. Self-defense in proper cases is the right of every person, it will not justify taking of a human life unless the Jurors shall be satisfied from the testimony first that the Defendant was not the aggressor in bring-

ing on the difficulty, that is, he was without fault,
second, that there existed at the time of the shooting in
his mind a present and impending necessity to shoot in
order to save himself from death or some great bodily
harm; and third, that there was—excuse me, there
must have been no way open whereby he could have
retreated as it appeared to him at the time of the
shooting to a place of safety and thus avoid the conflict.
Unless you find all three of these facts are established
in the case, the plea of self-defense fails. The burden of
proof of all such matters is upon the people to show
that the respondent is guilty of the offense charged, and
the People's testimony must be such as to satisfy the
Jurors that the killing was not done in self-defense. The
burden is not upon the Defendant who makes the
defense of self-defense to satisfy the Jury of the truth of
his claim." (Emphasis added.)

After approximately one and one-half hours of
deliberation the jury asked for clarification of the
elements of second-degree murder and manslaugh-
ter and the difference between the two offenses. In
response to their inquiry, the court stated:

"*The Court:* Well, I think instead of going through all
of the definitions, I think maybe I can give you the
substance of it. I perhaps should say that murder in the
second degree is composed of all the elements of murder
in the first degree, except that in murder in the second
degree you do not have any deliberation and premedita-
tion. * * * Now I don't think there is any need for me
to define murder again to you, because I think I have
defined that.

"Now the elements of manslaughter are as follows:
the killing of another without legal justification; two,
there need be no intention to kill; three, there need be
no malice; fourth, there must be unlawful act by the
accused; five, death must be the direct consequence of
such unlawful act. Now that is as far as I think I can go
without, you know, going into detail as I have before.
But I think that more or less is a substance of I think
what you are inquiring about, is that correct?

*"Mr. Foreman:* Yes, sir.
*"The Court:* All right."

No objections were made to any of the instructions and the jury returned a verdict of guilty of second-degree murder.[1] Appellant was sentenced to serve a term of 8 to 20 years in prison and his conviction was affirmed by the Court of Appeals, 44 Mich App 383; 205 NW2d 258 (1973). Leave to appeal was thereafter granted by this Court, 389 Mich 796 (1973).

In the instant case we must determine if the unobjected to jury instructions were so erroneous that appellant was denied a fair trial. Normally we will not reverse a conviction on the basis of errors found in the jury instructions unless an objection to the erroneous portion of the instruction was raised at trial. "Nevertheless, * * * this Court, in the exercise of supervisory control over all litigation, has often asserted the right to consider manifest and serious errors although objection was not made by the party who appeals. The inherent power of this Court to prevent fundamental injustice is not limited by what appellant is entitled to as a matter of right." *People v Dorrikas,* 354 Mich 303, 316; 92 NW2d 305 (1958) (per T. M. KAVANAGH, J.).

For the reasons expressed below we have concluded that fundamental errors were present in the disputed instructions and necessitate granting defendant a new trial. We proceed to consider each portion of the instructions in turn.

I

In *People v Murray,* 72 Mich 10, 16; 40 NW 29

---

[1] MCLA 750.317; MSA 28.549.

(1888), the Court observed that in a criminal case the trial judge has the responsibility to see that the case goes to the jury in an intelligent manner "so that they may have a clear and correct understanding of what it is they are to decide". Similarly, in *People v Liggett,* 378 Mich 706, 714; 148 NW2d 784 (1967), the Court wrote:

> "It is settled law of this State that the trial judge should instruct the jury in criminal cases as to general features of the case, define the offense and indicate that which is essential to prove to establish the offense, even in the absence of request. A case may be reversed because the charge omits a legally essential ingredient. *People v. Prinz,* 148 Mich 307 [111 NW 739 (1907)]; *People v. Kanar,* 314 Mich 242, 254 [22 NW2d 359 (1946)]; *People v. Hearn,* 354 Mich 468 [93 NW2d 302 (1958)]. Similarly, without a request, a case may be reversed because of an erroneous or misleading charge as opposed to one which merely omits a pertinent though not legally necessary point. *People v. Mac-Pherson,* 323 Mich 438, 448 *et seq.* [35 NW2d 376 (1949)]; *People v. Guillett,* 342 Mich 1, 7 [69 NW2d 140 (1965)]; *People v. Oberstaedt,* 372 Mich 521, 526 [127 NW2d 354 (1964)]. Defendant has a right to have a properly instructed jury pass upon the evidence. *People v. Visel,* 275 Mich 77, 81 [265 NW2d 781 (1936)]."

See also, *People v Reece,* 9 Mich App 108; 155 NW2d 870 (1967); *People v Sherman,* 14 Mich App 720; 166 NW2d 22 (1968).

In the present case the trial court was obviously confused about the law of manslaughter. The court at first delivered an undifferentiated manslaughter charge that consisted of the elements of both voluntary and involuntary manslaughter. The court's confusion was apparently transmitted to the jury. Shortly after the jury retired to deliberate it requested additional instructions clarifying the difference between second-degree murder and

manslaughter. In the supplemental instructions it defined manslaughter only in terms of the elements of involuntary manslaughter and omitted a charge on the elements of the more applicable offense of voluntary manslaughter. The court in attempting to answer the jury's question compounded the confusion. The jury resumed its deliberation and within 20 minutes returned a verdict of second-degree murder.

It is our opinion that the court erred by not providing the jury with a reasonable understanding of the nature of the offenses over which it specifically charged the jury to deliberate. From the composite of elements stated we doubt that the jury appreciated the severity, or even understood the existence of the offense of voluntary manslaughter. Whatever proper understanding of the offense the jury at first took with it into the jury room was certainly negated by the supplemental instruction. The jury had little reasonable choice under these instructions but to return a verdict of second-degree murder; the court, in effect, removed voluntary manslaughter from the jury's consideration. *People v Guillett,* 342 Mich 1, 8; 69 NW2d 140 (1955).

A large measure of the confusion in the jury instruction here in issue results, no doubt, from the fact that manslaughter encompasses several distinct modes of conduct not defined by statute.[2] In Michigan the statutory provision on manslaughter, MCLA 750.321; MSA 28.553, prescribes only the penalty for the crime leaving the definition to be found at common law. *People v Stubenvoll,* 62

---

[2] In addition to the common-law crime of manslaughter, the elements of which are not defined by statute, there are a number of specific statutes that do define death resulting from certain specified acts as manslaughter. *See,* for example, MCLA 750.236; MSA 28.433; MCLA 750.322; MSA 28.554; and, MCLA 750.329, MSA 28.561.

Mich 329, 331; 28 NW 883 (1886). At common law
manslaughter is divided into two general categor-
ies—voluntary and involuntary manslaughter.
*People v Carter,* 387 Mich 397, 418; 197 NW2d 57
(1972); 14 Wayne L Rev 904, 924 (1968). Both
categories of the offense proscribe the unlawful
killing of another without legal justification or
excuse and are distinguished from the higher
crimes of murder by the absence of malice. *Wellar
v People,* 30 Mich 16, 19 (1874); *People v Younger,*
380 Mich 678, 681–682; 158 NW2d 493 (1968);
*People v Onesto,* 203 Mich 490, 496; 170 NW 38
(1918). Beyond these similar elements, however,
voluntary and involuntary manslaughter are dis-
tinct and separate offenses.

From the standpoint of a defendant's culpability,
voluntary manslaughter is the more serious of the
categories. It requires that a defendant be found to
have had an intent to kill or an intent to do
serious bodily harm to the deceased. To this extent
the offense parallels the crime of murder; but, as
noted above, it is distinguished from murder by an
absence of malice. To reduce a homicide to volun-
tary manslaughter the fact finder must determine
from an examination of all of the circumstances
surrounding the killing that malice was negated
by provocation and the homicide committed in the
heat of passion.[3] *People v Scott,* 6 Mich 287, 295
(1859). Justice CHRISTIANCY defined voluntary man-
slaughter in the early case of *Maher v People,* 10
Mich 212, 219–220 (1862):

"But if the act of killing, though intentional, be

---

[3] The word "passion" in the context of voluntary manslaughter
describes a state of mind incapable of cool reflection. A defendant
acting out of a state of terror, for example, is considered to have acted
in the "heat of passion." *Commonwealth v Colandro,* 231 Pa 343; 80 A
571 (1911); *Austin v United States,* 127 US App DC 180, 188; 382 F2d
129, 137 (1967).

committed under the influence of passion or in heat of
blood, produced by an adequate or reasonable provoca-
tion, and before a reasonable time has elapsed for the
blood to cool and reason to resume its habitual control,
and is the result of the temporary excitement, by which
the control of reason was disturbed, rather than of any
wickedness of heart or cruelty or recklessness of disposi-
tion; then the law, out of indulgence to the frailty of
human nature, or rather, in recognition of the laws
upon which human nature is constituted, very properly
regards the offense as of a less heinous character than
murder, and gives it the designation of manslaughter."

A defendant properly convicted of voluntary
manslaughter is a person who has acted out of a
temporary excitement induced by an adequate
provocation and not from the deliberation and
reflection that marks the crime of murder. *People
v Younger, supra,* 681–682; *People v Droste,* 160
Mich 66, 79; 125 NW 87 (1910); *People v Bucsko,*
241 Mich 1, 3; 216 NW 372 (1927).

The elements of involuntary manslaughter, al-
though not completely exclusive of those found in
voluntary manslaughter are distinguishable in sev-
eral respects. They define a crime that originates
out of circumstances often quite different from
those found in voluntary manslaughter and apply
to a defendant who did not proceed with the intent
to cause death or serious bodily injury. In the
leading case of *People v Ryczek,* 224 Mich 106,
110; 194 NW 609 (1923), the Court approved the
following definition of involuntary manslaughter:

" 'Involuntary manslaughter is the killing of another
without malice and unintentionally, but in doing some
unlawful act not amounting to a felony nor naturally
tending to cause death or great bodily harm, or in
negligently doing some act lawful in itself, or by the
negligent omission to perform a legal duty.' "[4]

---

[4] The negligence required to establish involuntary manslaughter is

The usual situations in which involuntary manslaughter arise are either when death results from a direct act not intended to produce serious bodily harm, *People v Carter,* 387 Mich 397, 419; 197 NW2d 57 (1972), *People v Austin,* 221 Mich 635, 643–645; 192 NW 590 (1923), or when death results from criminal negligence. *People v Stubenvoll,* 62 Mich 329; 28 NW 883 (1886); *People v Townsend,* 214 Mich 267; 183 NW 177; 16 ALR 902 (1921).

## II

Appellant's testimony placed in issue the defense of self-defense and the trial judge properly included a charge on self-defense in the jury instructions. *Cf. People v Welke,* 342 Mich 164; 68 NW2d 759 (1955). On appeal the parties have argued their respective position on the validity of this self-defense instruction as a matter of law. We find it unnecessary to review these arguments in detail. It is our finding that the instruction was not a factually proper self-defense instruction under the testimony developed at trial and failed to adequately present appellant's primary defense to the jury. The jury, of course, may have disbelieved appellant's testimony and therefore not have considered in detail his claim of self-defense. However, since we do not know the path taken by the jury in its deliberations, we are required to review the instruction under the assumption that the jury followed it in reaching its verdict. See, *People v Eggleston,* 186 Mich 510, 514–515; 152 NW 944 (1915).

The self-defense instruction was premised on the

different in kind from ordinary negligence. Such negligence is variously referred to as "criminal negligence" or "gross negligence" and has been discussed throroughly in several cases. *See* for example, *People v Orr,* 243 Mich 300; 220 NW 777 (1928); *People v Townsend,* 214 Mich 267; 183 NW 177; 16 ALR 902 (1921).

incorrect assumption that there had been some evidence introduced at trial from which the jury could reasonably infer that appellant was the "aggressor" in the fatal confrontation with Burnett. The court apparently focused on appellant's conduct with respect to Odom McMillion and erroneously assumed that if appellant was at fault in provoking a disturbance in the tire store, he could then be held legally accountable as an aggressor for any response to his conduct, whether by McMillion or any other person. This was error. Appellant may only be held legally accountable as an aggressor for responsive conduct by another that is reasonably attributable to appellant's own conduct. See *Cartwright v State,* 14 Tex Ct App R 486, 498–499, 502 (1883). In the present case there was no evidence that would support the inferences created by the self-defense instruction that Burnett's actions were a legally reasonable response to appellant's conduct and therefore, that appellant was an "aggressor" with respect to Burnett.

According to all the testimony developed at trial, the singular purpose underlying Burnett's intervention into the confrontation between appellant and McMillion was Burnett's desire to avoid a disruption in his store. There was no testimony to indicate that Burnett intervened to protect McMillion or Burnett's own person or that appellant's actions were designed as a pretext to draw Burnett into a situation where appellant could take Burnett's life. The only reasonable conclusion from the trial testimony is that appellant's actions created a potential threat to Burnett's property and it was to this threat that Burnett responded; but, a threat to property in such a situation, is not a legally sufficient provocation to render appellant an aggressor.

"It may be conceded that everything that was done by defendant in the transaction, up to the moment of the final attack by the deceased, was unlawful and wrongful; yet, if that assault was felonious and was of such a character as to clearly indicate an intention by the assailant to take defendant's life, or to inflict on him some enormous bodily injury, there is no valid ground for holding that he was precluded from the right to defend himself against it by the mere fact that he had been, or then was engaged in the commission of a trespass upon the property of the deceased. * * *

"The general doctrine undoubtedly is that one who has taken the life of an assailant, but who was himself in the wrong, cannot avail himself of the plea of self-defense. But the wrong which will preclude him from making that defense must relate to the assault in resistance of which the assailant was killed. If at the time the assault is made upon him, he is engaged in the commission of an act which is wrongful, but which is independent of the assault he may lawfully defend himself against it, to the extent even of slaying the assailant, if it is felonious, unless, indeed, his act is of such a character as to justify the assault. The mere fact, then, that defendant was engaged in committing a trespass when deceased attacked him * * * , does not necessarily constitute him a wrong-doer in the matter of the assault, or preclude him from making the defense of self-defense." *State v Perigo,* 70 Iowa 657, 666; 28 NW 452 (1886).

See also, Wharton, *The Law of Homicide* (3d ed), § 323; 40 Am Jur 2d, Homicide, § 146.

We again note that no objection was offered to the instruction as delivered; however, we nevertheless find reversible error herein. The appellant did not deny killing Burnett and his sole defense was self-defense. Certainly then, the presence or absence of a situation under which appellant would be foreclosed from claiming self-defense was very material to his cause. "The rule is well settled in this State that if an erroneous instruction is given

on a material matter and the error is not corrected * * * such error must be regarded as prejudicial." *People v Kanar,* 314 Mich 242, 253; 22 NW2d 359 (1946). See also, *People v Paxton,* 47 Mich App 144; 209 NW2d 251 (1973); *People v Bowen,* 10 Mich App 1, 18–20; 158 NW2d 794 (1968), and p 586, supra.

"[W]henever a judge, by his charge, proposes to deprive a defendant of his right of self-defense, he must be enabled to lay his hand on the facts which justify him in doing so; and, unless he can, he should abstain from giving a charge of this character, because, however groundless the charge may be, coming as it does from the court, it is calculated to make the jury believe that, in the opinion of the judge, there was evidence tending to show that appellant brought on the difficulty for the purpose of slaying his adversary, and consequently such an instruction, not authorized by the testimony, is calculated to injure or impair the rights of the defendant." *McCandless v State,* 42 Tex Crim 58, 64–65; 57 SW 672, 675 (1900).

The Court of appeals is reversed and the case remanded for a new trial.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH and LEVIN, JJ., concurred with SWAINSON, J.

WILLIAMS, J. *(concurring on one issue; dissenting on another; concurring in result).* My Brother SWAINSON's opinion accurately depicts the error in the trial court's manslaughter instruction. On this ground, I join in his disposition of reversal of the Court of Appeals and remand for new trial.

However, his opinion continues, finding error in the trial court self-defense instruction as "premised on the incorrect assumption that there had been some evidence introduced at trial from which

the jury could reasonably infer that appellant was the 'aggressor' in the fatal confrontation with Burnett." I cannot agree with this conclusion.

As my Brother SWAINSON notes:

"All of the prosecution's witnesses generally testified that after appellant backed out of the store, Burnett placed the gun in a holster he was wearing, turned and started to walk to the inner part of the store. Appellant then suddenly reentered the store and began shooting at Burnett, fatally wounding him."

The introduction of this testimony at trial *did* constitute evidence from which the jury might reasonably infer that appellant was the "aggressor" in his confrontation with Burnett. It has long been clear in Michigan that the right of self-defense commences and ceases when real or apparent necessity begins and ends. 3 Gillespie, Michigan Criminal Law & Procedure, § 1693, p 2045; *People v Giacalone,* 242 Mich 16, 21; 217 NW 758 (1928); *People v Walters,* 223 Mich 676, 682–683; 194 NW 538 (1923); 13 Michigan Law & Practice, Homicide, § 42, p 369. See also 1 Wharton's Criminal Law & Procedure, § 214, p 470. If the jury believed the prosecution witnesses in this case, they could have reasonably found that appellant ceased to possess a right to self-defense when he "backed out of the store"; his sudden reappearance, gun ablaze, could certainly be reasonably construed by the jury as a subsequent and independent act of aggression.

Therefore, while the trial court instruction on self-defense was far from a model of clarity, it was based on a proper theory of law. However, it should have been only one of two instructions, the other based on my Brother SWAINSON's interpretation of the facts, so that the jury would have had a

proper instruction of law for the fact situation they deemed to be the true one.

Reversed and remanded for new trial.

M. S. COLEMAN, J., concurred with WILLIAMS, J.

J. W. FITZGERALD, J., did not sit in this case.