# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DONALD MAURICE PORTER,

Defendant-Appellant.

UNPUBLISHED
July 19, 2018

No. 336844
Wayne Circuit Court
LC No. 16-006044-01-FC

Before: FORT HOOD, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

A jury convicted defendant of involuntary manslaughter, MCL 750.321, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] The trial court sentenced defendant to 38 months to 15 years' imprisonment for the manslaughter conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. Defendant appeals as of right. We affirm defendant's convictions and sentences, but remand for correction of certain inaccuracies in the Presentence Investigation Report ("PSIR").

## I. FACTUAL BACKGROUND

Defendant's convictions arise from the shooting death of Patricia Walker, which occurred at approximately 9:00 p.m., on May 25, 2016. It is undisputed that defendant shot Walker, causing her death. The primary issue at trial was intent. The prosecution argued that defendant intentionally shot Walker, whereas defendant's theory of the case was that the shooting was an accident.

On May 25, 2016, defendant and his friend, Samuel Jones, drove to a party store to buy some wine and grape juice. While at the store, defendant encountered Walker, a friend and former neighbor he had not seen for several months. Defendant agreed to give Walker a ride to the new apartment she planned to rent. After arriving at the apartment, defendant parked his

---

[1] Defendant was originally charged with first-degree premeditated murder, MCL 750.316(1)(a), and felony-firearm. The jury acquitted defendant of first-degree murder and found him guilty of the lesser offense of involuntary manslaughter.

-1-

truck. Defendant admitted that everyone was drinking in the truck. Defendant removed the keys from the ignition and placed them on the center console area or seat area of the truck. At some point, defendant was not able to locate his keys. The events that transpired thereafter are disputed, but they culminated with Walker incurring a fatal gunshot wound to her upper chest.

In a statement given to the police approximately 24 hours after the shooting, Jones stated that Walker was sitting in the back seat of the truck, while Jones sat in the front-passenger seat. Defendant drove to Walker's apartment building, parked behind the building, and the three of them stayed in the truck and drank. At some point, defendant and Walker started making out. Jones then described an altercation that arose over defendant's keys. According to Jones, Walker took defendant's keys and demanded a kiss in exchange for the return of the keys. Defendant became very angry and, according to Jones, defendant pulled a gun out of the waistband of his pants and fired the gun into the air in an attempt to scare Walker into returning the keys. Jones stated that at the time defendant fired the gun, Walker was standing outside the truck, next to the open passenger side door. However, he also stated that when defendant pulled out and fired the gun, Walker was running away from the truck. Jones denied knowing that Walker had been shot and said he thought she ran into her apartment and called the police.

At the preliminary examination, however, Jones stated that the shooting was an accident. At trial, Jones testified that he could not remember any statements he had made to the police because he was intoxicated at the time he gave the statements. The parties stipulated to admit a video recording of Jones's police interrogation in its entirety, and the video was played for the jury. Although Jones claimed a failure to recall the events of May 25, 2016 due to his intoxication at the time, he adamantly denied at trial that he hit defendant's hand and that this contact made defendant fire the gun. He denied that he had anything to do with the gun or defendant's side of the vehicle. Jones also denied that he lifted up the hinged lid of the center console to look for the keys. Jones testified that he never saw defendant point the gun at Walker.

In contrast to Jones's testimony and statements, defendant testified that the shooting was a tragic accident. He testified that he asked Walker if she had the keys. He claimed that Jones accused Walker of having them and those two argued. Defendant denied that he argued with Walker about the keys, but admitted that he became irritated, although not with Walker. Defendant stated that Walker was helping to look for the keys, but Jones was not. In fact, Jones was intoxicated and making a lot of commotion. Defendant testified that he had a concealed pistol license (CPL) and owned a gun that he stored under the front seat on the floor board of the truck. Defendant explained that he removed the gun from under the seat so he could more thoroughly look for the missing keys. Defendant then explained what happened next:

> When I was feeling up under the seat, excuse me, and I could not feel the keys, and when I pulled the weapon up to put it on, on the console seat area under the armrest, [Jones] was facing away from it. He reached back and, and threw swiftly, unexpectedly threw the seat, the armrest up. And I'm not sure if him or the, or the armrest, itself, hit the, hit the weapon and caused it to discharge, and, and I lost control of the weapon at that point.

-2-

Defendant reiterated that he had his hand on the gun, that he lost control of the weapon when his hand was hit, and that when he tried to regain control of the gun, it discharged. He repeatedly asserted that Jones, who was sitting in the front passenger seat, pulled the armrest up.

According to defendant's trial testimony, when the gun discharged, he did not know at that point that Walker had been shot. Indeed, after the gun fired, Walker, without saying a word, turned and walked toward the apartment building. Defendant was shocked when the gun discharged and he turned to discuss something with Jones. They then resumed their search for the keys. Defendant also took his pistol and secured it to his person. Defendant said he did not call the police because he did not believe Walker had been shot. Defendant thought Walker ran because she was frightened and she needed to talk to the apartment manager. He never attempted to leave the scene because he was waiting for Walker to return to retrieve items she had left in the back seat. Shortly thereafter, the police arrived and defendant was arrested.

On cross-examination, defendant testified that his finger was not on the trigger when the gun fired. However, he later testified in response to questioning by defense counsel:

> *Q*. What caused the gun to discharge, Mr. Porter?
>
> *A*. Well, once it was struck I grasped it trying to get control of the weapon.
>
> *Q*. And that's when the weapon discharged?
>
> *A*. Yes, ma'am.

Defendant testified several times that his finger was not on the trigger when he picked up the gun, but then later testified that "[i]t was near the trigger, but it had to be on it in order for it to fire."

After Walker was shot, she ran from the truck to the front of the apartment building, about 45 yards, where she fell to the ground. Three witnesses spoke to Walker while she was lying in the grass waiting for emergency assistance to arrive. Walker identified a man named "Donald" as the person who shot her. She further stated that Donald thought she had his keys, but she did not, and that Donald was mad. Walker told her niece, Crystal Walker, that defendant "pulled out his weapon and he shot me like he didn't know me."

Several police officers who were present at the scene of the shooting testified at trial. Officer Courtney Swilley confronted defendant, who was in his truck. She removed a .40 caliber Glock semi-automatic pistol from defendant's waistband. Defendant admitted to Swilley that he and Walker had been arguing over his keys. It appeared to Officer Swilley that defendant had been drinking. He was wobbly, his speech was slurred, and his pants were wet, as if he had just urinated on himself. Officer Shawn Kolonich, an expert in firearms, examined defendant's Glock semi-automatic pistol and concluded that it would take six pounds of pressure to cause the firearm to fire. The gun also had an internal safety system that prevented it from firing without a finger, or something, actually being on and pulling the trigger. Dropping the gun would not cause it to fire.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

For his first claim of error, defendant ostensibly challenges the sufficiency of the evidence in support of his conviction of involuntary manslaughter. We review de novo challenges to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). The record evidence is viewed in a light most favorable to the prosecution to determine whether a trier of fact could conclude that the elements of the crime were proved beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

The jury acquitted defendant of first-degree murder, but convicted him of the lesser offense of involuntary manslaughter. Involuntary manslaughter has been defined as "the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty." *People v Townes,* 391 Mich 578, 590; 218 NW2d 136 (1974). Ordinary negligence is insufficient to establish involuntary manslaughter. *Id*. at 590 n 4. Instead, the death must result from gross negligence. *Id*. "Gross negligence means wantonness and disregard of the consequences that may ensue." *People v Head,* ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 334255), lv pending; slip op at 2. "Wantonness exists when the defendant is aware of the risks but indifferent to the results. . . [.]" *Id.* Consequently, to prove gross negligence, the prosecution must show:

> (1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.
>
> (2) Ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand.
>
> (3) The omission [i.e., failure] to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another. [*Id* (citation omitted).]

Defendant does not argue that the evidence presented at trial was insufficient to prove these elements of involuntary manslaughter. Instead, he argues that certain hearsay statements by Walker were not admissible and, if these statements are not considered, the remaining evidence was insufficient for a rational trier of fact to find him guilty of involuntary manslaughter beyond a reasonable doubt. Thus, defendant's challenge to the sufficiency of the evidence is tied to the admissibility of the challenged hearsay statements. We review a trial court's decision to admit evidence for an abuse of discretion. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Danto*, 294 Mich App 596, 598-599; 822 NW2d 600 (2011).

The trial court permitted three witnesses, Kenneth Gibbs, Crystal Walker, and Rodrick Williams, to testify regarding statements Walker made after she was shot. The trial court ruled that the statements, although hearsay, were admissible as excited utterances. All three witnesses

testified that Walker identified defendant as the person who shot her. Walker similarly told all three witnesses that defendant mistakenly thought she had his keys. Additionally, Walker told Crystal that defendant was angry and that "he pulled out his weapon and shot me like he didn't know me."

An out-of-court statement offered to prove the truth of the matter asserted is hearsay. MRE 801(c). Hearsay is not admissible except as provided by the rules of evidence. MRE 802. MRE 803(2) provides an exception to the hearsay rule for a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998), the Michigan Supreme Court explained the underlying rational of the excited utterance exception to the hearsay rule:

> The rule allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the "sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." [Quoting 5 Weinstein, Evidence (2d ed), § 803.04[1], p 803-19.]

As the prosecution notes in its brief on appeal, "it is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule." *Id.* at 551.

It this case, it is undisputed that Walker was shot, and that immediately after being shot, she ran approximately 45 yards before collapsing in the grass in front of the apartment building. The three witnesses came upon Walker shortly after the shooting. Walker appeared to be in pain, but was still able to speak with the individuals gathering around her. Receiving a gunshot to the chest is undoubtedly a startling event. Moreover, it can reasonably be inferred that the shooting caused Walker to experience trauma and anxiety, and that she was still under the influence of this stress when she made the statements. Accordingly, the trial court did not abuse its discretion by admitting Walker's statements under MRE 803(2).[2] Where defendant's sufficiency-of-the-evidence argument is premised entirely on the assertion that the jury considered inadmissible hearsay, and because we have concluded that defendant's evidentiary challenges are without merit, we therefore reject defendant's argument that the properly considered evidence was insufficient to prove the elements of involuntary manslaughter.

## B. HEARSAY-INTERROGATION VIDEO

---

[2] The prosecution contends that defendant has failed to address the admissibility of Gibbs's testimony. Although defendant states in his brief on appeal that the testimony of Crystal Walker and Rodrick Williams "determined the outcome of this case," he does not completely ignore the testimony of Kenneth Gibbs. Although inartfully addressed, defendant appears to also argue that Walker's statements to Gibbs could not have been admitted as a dying declaration, MRE 804(b)(2). Because Walker's statements to all three witnesses qualify as excited utterances, it is unnecessary for us to consider whether the statements would also have been admissible under MRE 804(b)(2).

Approximately 24 hours after Walker was shot, the police interviewed Jones. A video recording of Jones's interrogation was admitted at trial and played for the jury in its entirety. Although defendant agrees that portions of the video were admissible to impeach the witness, he contends that the video was used beyond its limited permissible purpose of impeaching the witness.

In *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000), the Michigan Supreme Court acknowledged the soundness of the axiom that, in order to discourage counsel from harboring error as an anticipated appellate parachute, issues for appeal must be preserved in the record by a timely objection. The Court in *Carter* explained the differences between waiver and forfeiture:

> Waiver has been defined as the intentional relinquishment or abandonment of a known right. It differs from forfeiture, which has been explained as the failure to make the timely assertion of a right. One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error. Mere forfeiture, on the other hand, does not extinguish an error. [*Id*. at 215 (quotations and citations omitted.)]

Accordingly, when defense counsel fails to object and, indeed, expressly acquiesces to proceeding in a specific manner, a defendant may not then raise the issue on appeal. *Id*. at 214.

In this case, defense counsel unequivocally stipulated to the admission of the entire interrogation video. The trial court specifically asked if defendant was stipulating to the admission of the recording in its entirety. In response, defense counsel stated: "Yes. We ask that the – if the video is going to be played that the entire video be played." Defense counsel reiterated this sentiment two more times before the entire video was played to the jury. Because defense counsel specifically stipulated to the admission of the entire interrogation video, defendant has waived his right to now object to its admissibility. *Id.* at 209. "T[he] waiver extinguishes any error and precludes defendant from raising the issue on appeal." *Id.*

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues, alternatively, that he was denied the effective assistance of counsel when defense counsel failed to object to the use of the interrogation video for any purpose other than to impeach the witness. Because defendant did not move for a new trial or evidentiary hearing below, our review of this issue is limited to mistakes apparent on the record. *People v Payne,* 285 Mich App 181, 188; 774 NW2d 714 (2009). The issue of ineffective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "Effective assistance of counsel is presumed, and a defendant bears a heavy burden of proving otherwise." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). As the Michigan Supreme Court recently recognized in *People v Randolph*, ___ Mich ___, ___; ___ NW2d ___ (2018) (Docket No. 153309); slip op at 6:

> [E]stablishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Prejudice means a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Footnotes and quotation marks omitted.]

Defendant has failed to overcome the presumption that defense counsel stipulated to the admission of Jones's entire interrogation video as a matter of sound trial strategy. It was clear before Jones testified that he would be an unpredictable witness. In his recorded statement, taken approximately 24 hours after the shooting, Jones claimed that defendant raised the gun and shot upward in an attempt to scare Walker into returning his keys. By contrast, Jones testified at the preliminary examination that the shooting was accidental. That Jones would continue to be unpredictable at trial was immediately apparent as evidenced by the fact that when he took the witness stand, the first question asked by the prosecutor was whether he was under the influence of alcohol. Indeed, examination of the witness was briefly suspended so that he could submit to a breathalyzer. The prosecutor was able to elicit some preliminary questions related to how Jones and defendant ended up with Walker at the apartment building. However, when questioned for the first time about the circumstances of the actual shooting and whether he recalled giving a statement to the police, Jones testified that he was drunk when he gave the statement, and he did not recall what he said to the officer. The prosecutor prepared to impeach Jones with the video from his interrogation, in which he clearly stated at the time of the interrogation that he was not drunk. At that point, the parties stipulated to playing the entire interrogation video to the jury.

Defendant's theory of the case was that the shooting was an accident. Defense counsel argued to the jury that defendant was in the process of reasonably removing the legally owned pistol from underneath the car seat so that he could more safely search for the missing keys and that the gun went off when an intoxicated Jones unexpectedly raised the center console lid or armrest and struck the gun that was in defendant's hand. Defense counsel argued that defendant accidentally pulled the trigger while he was attempting to regain control of the weapon. Jones's unpredictability jeopardized the believability of defendant's theory of the case.

Indeed, at trial, that is exactly what happened. Although Jones testified that he was drunk when he gave his statement to the police, and that he did not recall the events of that evening, he very clearly recalled and adamantly denied any suggestion that he accidentally struck defendant's hand and that this caused the gun to discharge. Specifically, Jones testified at trial that he did not lift up the hinged lid of the center console to look for keys, that he did not have anything to do with the gun or defendant's side of the vehicle, and that he never struck defendant's hand with anything. Because the jury had seen the entire interrogation video, defendant was in a position to point out all of the inaccuracies and inconsistencies in Jones's testimony and statement, and to then implore the jury to completely disregard anything Jones stated in his trial testimony. This is exactly what defense counsel did in her closing argument.

Specifically, defense counsel pointed out all of the implausible statements Jones made to the police. Counsel noted that Jones told the police that defendant took his pants off when he pulled out his gun. Counsel also pointed out the implausibility of Jones's statement that Walker was running away when the gun was fired, considering that Walker was not shot in the back. After pointing out these inconsistencies and inaccuracies, defense counsel argued to the jury that

it should not, as the prosecutor suggested, pick and choose portions of Jones's statements to believe. Defense counsel argued that Jones was not a credible or reliable witness, in any regard.

Defense counsel's approach was sound trial strategy. Had the jury simply observed the prosecutor impeach Jones with carefully selected statements from the police interrogation, the prosecutor would have controlled the narrative. By stipulating to the admission of the entire video, defendant was in a better position to discredit Jones as a witness. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). Accordingly, defendant has failed to demonstrate that he was denied the effective assistance of counsel.

## D. ACCURACY OF JUDGMENT OF SENTENCE

At trial, the court instructed the jury on the lesser offense of common-law involuntary manslaughter based on gross negligence. The judgment of sentence reflects that the jury found defendant guilty of manslaughter and MCL 750.321 is listed as the charging code. Defendant argues that he is entitled to have the judgment of sentence corrected to state that he was convicted of "involuntary" manslaughter. We disagree.

Michigan recognizes the common-law crime of manslaughter. *Townes,* 391 Mich at 588. Further, MCL 750.321[3] "prescribes only the penalty for the crime leaving the definition to be found at common law." *Id.* Over forty years ago, the Michigan Supreme Court in *Townes* stated that "[a]t common law manslaughter is divided into two general categories—voluntary and involuntary manslaughter." *Id.* at 589. Similarly, in *Head,* ___ Mich App at ___; slip op at 2, this Court recently stated that "[t]he common law recognizes two forms of manslaughter: voluntary and involuntary." (Citation omitted.) While the crime may have two forms or categories recognized by the common law, the offense is still simply that of manslaughter. Consistent with this conclusion, this Court in *In re Nale Estate*, 290 Mich App 704, 708; 803 NW2d 907 (2010), citing *Townes,* 391 Mich at 588-589, stated that "the manslaughter statute, MCL 750.321, encompasses two types of common-law manslaughter: voluntary and involuntary." Because MCL 750.321 encompasses both types of common-law manslaughter, and the judgment of sentence reflects that defendant was found guilty of "manslaughter," pursuant to MCL 750.321, the judgment of sentence accurately reflects defendant's convicted offense. Accordingly, remand for correction of the judgment of sentence is not necessary.

## E. ACCURACY OF PSIR

---

[3] MCL 750.321 provides:

Any person who shall commit the crime of manslaughter shall be guilty of a felony punishable by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars, or both, at the discretion of the court.

At sentencing, defendant challenged the accuracy of several statements in his PSIR. While some of the inaccuracies were corrected at sentencing, defendant asserts that inaccuracies still exist. We agree.

At sentencing, the prosecutor noted an error in the scoring of Offense Variable ("OV") 3. As a result of the correction of this error, defendant's sentencing guidelines range changed from 29 to 57 months to 19 to 38 months. Although the trial court made the correction in the "Disposition" section of the Basic Information Report, it did not make a similar correction in paragraph six of the section entitled "Evaluation and Plan." To avoid any confusion in the future, this oversight should be corrected.

Defendant also argues that the trial court improperly resolved his objection to the inclusion of any reference to a personal protection order ("PPO") in the PSIR. The author of the PSIR noted that a PPO was entered against defendant for the protection of a certain individual. At sentencing, defendant asked that this reference to a PPO be stricken because he had never been served with a PPO and he did not know the named protected person. The prosecutor had no information related to this entry and the trial court's clerk indicated that there was no way to verify the existence of the PPO. The trial court resolved defendant's challenge by simply noting twice in the PSIR that "[d]efendant objects to the mention of a personal protection order and denies it." In its brief on appeal, the prosecution acknowledges that the trial court did not resolve the dispute regarding the PPO and indicates that it does not object to striking any reference to the PPO in the PSIR. Consequently, on remand, any reference to the existence of a PPO should be stricken from the PSIR.

In the family reporting section of the PSIR, the author reported that defendant's daughter described her father as a "work alcoholic," instead of a "workaholic." In addition, defendant asserts that in the second paragraph of the Evaluation and Plan section of the PSIR, it incorrectly states that he earned $100 to $200 a day in his seasonal employment as a sailing instructor. Defendant represents that he actually earned $100 to $200 a month. Defendant did not object to the accuracy of either of these statements at sentencing. In fact, after certain errors were brought to the trial court's attention, defendant indicated at sentencing that no other changes needed to be made to the PSIR, other than those already identified at the hearing. Not only did defendant not raise a challenge to the accuracy of the information, he affirmatively expressed satisfaction with the rest of the PSIR. Accordingly, defendant has waived his right to later object to this information in the PSIR. MCR 6.429(C); *People v Bailey*, 218 Mich App 645, 647; 554 NW2d 391 (1996).

Finally, defendant objects to the court only making hand-written corrections to the PSIR. He asserts that the PSIR should be retyped and devoid of any "crossed out or lined-through information" before it is forwarded to the Department of Corrections. We disagree.

MCL 771.14(6) provides:

At the time of sentencing, either party may challenge, on the record, the accuracy or relevancy of any information contained in the presentence investigation report. The court may order an adjournment to permit the parties to prepare a challenge or a response to a challenge. If the court finds on the record

-9-

that the challenged information is inaccurate or irrelevant, that finding shall be made a part of the record, *the presentence investigation report shall be amended, and the inaccurate or irrelevant information shall be stricken* accordingly before the report is transmitted to the department of corrections. [Emphasis added.]

MCL 771.14(6) requires that inaccurate or irrelevant information be "stricken." Because the statute does not define "stricken," the word should be interpreted according to its plain and ordinary meaning. *People v Brooks*, 304 Mich App 318, 320; 848 NW2d 161 (2014). It is proper to consult a dictionary to ascertain the ordinary meaning of a word. *Id*. The *New Oxford American Dictionary* (3d ed) defines "strike" to include "cancel, remove, or cross out with or as if with a pen." Because the act of crossing out incorrect information is consistent with the statutory requirement that inaccuracies be "stricken" from the PSIR, a trial court does not abuse its discretion when it simply crosses out incorrect information. Defendant has failed to provide any authority for his position that he is entitled to a retyped version of the PSIR devoid of any "crossed out or lined-through information." There is simply no requirement that a completely new report be prepared.

We affirm defendant's convictions and sentences, but remand for correction of the PSIR consistent with this opinion. We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto
/s/ Jane M. Beckering

-10-