PEOPLE v PARNEY

Docket No. 78-3353. Submitted June 18, 1979, at Lansing.—Decided December 10, 1979.

Junior L. Parney was found guilty of second-degree murder but mentally ill in Hillsdale Circuit Court, Kenneth G. Prettie, J. He appeals, alleging the trial court erred in (1) admitting a tape recorded conversation with the alleged victim into evidence as a dying declaration, and (2) failing to instruct the jury on the lesser included offense of manslaughter. *Held:*

1. The trial court erred in admitting the tape-recorded conversation into evidence as a dying declaration since there was no clear demonstration that the decedent had a consciousness of impending death when she made the statement. However, the statement shed little light on defendant's state of mind at the time of the shooting and constituted only harmless error, not requiring a reversal of defendant's conviction.

2. The jury should have been instructed on the elements of both second-degree murder and manslaughter, since, in addition to sufficient evidence to support a conviction of second-

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 493.
[2, 3] 29 Am Jur 2d, Evidence § 677.
[3] 40 Am Jur 2d, Homicide §§ 348, 351, 365-368.
    Statements of declarant as sufficiently showing of conciousness of impending death to justify admission of dying declarations. 53 ALR3d 785.
[4] 40 Am Jur 2d, Homicide § 468.
[5, 6] 40 Am Jur 2d, Homicide § 560.
[7] 40 Am Jur 2d, Homicide §§ 54, 227, 438.
[8] 40 Am Jur 2d, Homicide §§ 54, 70.
[9] 40 Am Jur 2d, Homicide § 216.
[10] 40 Am Jur 2d, Homicide §§ 530, 531.
[11] 40 Am Jur 2d, Homicide § 61.
[12] 40 Am Jur 2d, Homicide §§ 64, 66.
    Spouse's confession of adultery as affecting degree of homicide involved in killing spouse or his or her paramour. 93 ALR3d 925.
[13] 40 Am Jur 2d, Homicide §§ 56 *et seq.,* 114, 515.
    Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.

degree murder, it is equally possible that the defendant, although not insane, was sufficiently unbalanced or deranged by his argument with the victim that he lacked the capacity for malice necessary for a jury to find him guilty of second-degree murder.

Reversed and remanded.

MacKenzie, J., dissented. She would hold that the trial judge's refusal to instruct the jury on the elements of manslaughter was proper, since the element of provocation necessary for a finding of manslaughter could not be satisfied by the fact that the defendant became unbalanced or deranged by his argument with the decedent. She would affirm.

### OPINION OF THE COURT

1. EVIDENCE — HEARSAY — OUT-OF-COURT STATEMENT — UNAVAILABLE DECLARANT.

An out-of-court statement made by a declarant who is not available for cross-examination is inadmissible as being hearsay.

2. EVIDENCE — HEARSAY — DYING DECLARATIONS — STATUTES — CRIMINAL LAW.

A statement made by a declarant while believing that his death is imminent concerning the cause or circumstances of what he believed to be his impending death is admissible as an exception to the hearsay rule (MRE 804[b][2]).

3. EVIDENCE — DYING DECLARATIONS — PREREQUISITES — CRIMINAL LAW.

Four requirements must be met before a statement can be admitted into evidence as a dying declaration: (1) the declarant must have been conscious of impending death, (2) death must actually have ensued, (3) the statements are sought to be admitted in a criminal prosecution against the individual who killed the decedent, and (4) the statements must relate to the circumstances of the killing.

4. EVIDENCE — DYING DECLARATIONS — ADMISSIBILITY — TRIAL COURT.

It is a trial court's duty to determine whether a statement is admissible into evidence as a dying declaration.

5. APPEAL — TRIAL COURT — STANDARD OF REVIEW — FINDINGS OF FACT — DYING DECLARATIONS — ERROR.

A reviewing court will not set aside a trial court's findings of fact in determining a statement was a dying declaration unless the reviewing court is left with a definite and firm conviction that

such findings of fact were clearly erroneous; this standard applies to bench and jury trials alike.

6. APPEAL — EVIDENCE — DYING DECLARATIONS — HARMLESS ERROR — REVERSAL.

The clearly erroneous admission by a trial court of a statement into evidence as a dying declaration does not require reversal on appeal where the error was harmless.

7. HOMICIDE — VOLUNTARY MANSLAUGHTER — ELEMENTS — ABSENCE OF MALICE — PROVOCATION — INTENTIONAL HOMICIDE.

Voluntary manslaughter shares all the elements of murder except the element of malice, and proof of some sort of provocation or other mitigating circumstances is necessary to return a verdict of guilty of voluntary manslaughter where there has been an intentional homicide.

8. HOMICIDE — INVOLUNTARY MANSLAUGHTER — ELEMENTS — ABSENCE OF MALICE — NEGLIGENCE — INADVERTENCE.

Involuntary manslaughter arises where a death occurs without malice and unintentionally but rather as a result of gross, criminal, and culpable negligence or inadvertence.

9. HOMICIDE — CHARGES — LESSER-INCLUDED OFFENSES — MURDER — MANSLAUGHTER — EVIDENCE — TRIAL.

Manslaughter may be a lesser but included offense to a charge of murder if evidence adduced at trial would support a verdict of manslaughter.

10. HOMICIDE — TRIAL COURTS — REVERSIBLE ERROR — JURY INSTRUCTIONS — MANSLAUGHTER — SUPPORTING EVIDENCE.

It is reversible error for a trial court to fail to instruct a jury on the elements of manslaughter where there was evidence to support such a theory and a proper request for such an instruction was made.

DISSENT BY MACKENZIE, J.

11. HOMICIDE — VOLUNTARY MANSLAUGHTER — PROOF OF PROVOCATION.

*There must be proof of adequate or reasonable provocation before a verdict of guilty of voluntary manslaughter may be returned where there has been an intentional homicide.*

12. HOMICIDE — MURDER — MANSLAUGHTER — PROVOCATION — WORDS ALONE.

*Language alone, however aggravated, abusive, opprobrious, or indecent, is insufficient provocation to reduce a killing commit-*

ted with a deadly weapon from murder to manslaughter unless the words convey information of a fact which would constitute reasonable provocation if the fact was observed, such as confession of adultery to a spouse.

13. HOMICIDE — MANSLAUGHTER — PROVOCATION — LEGAL SUFFICIENCY — TRIAL COURTS — JURY INSTRUCTIONS — ERROR.

The fact that a defendant in a murder trial may have been rendered unbalanced or deranged by an argument with his victim does not transform an otherwise legally insufficient provocation into a legally sufficient one, and a refusal by a trial judge to instruct the jury on the elements of manslaughter under such circumstances does not constitute error.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Ronald C. Zellar,* Prosecuting Attorney, and *Leonard J. Malinowski,* Assistant Attorney General, for the people.

*Rolf E. Berg,* Assistant State Appellate Defender, for defendant on appeal.

Before: CYNAR, P.J., and MACKENZIE and L. W. CORKIN,* JJ.

PER CURIAM. This case arises from the defendant's shooting of Ms. Roberta Kurtz, with whom he had been carrying on a somewhat stormy relationship for about a year and a half. Ms. Kurtz's two daughters, Brenda and Cynthia, were present at the time of the shooting and give substantially similar testimony.

On the morning of August 11, 1975, Ms. Kurtz and defendant argued for some two hours over whether defendant could spend the next weekend with the Kurtz family. Ms. Kurtz remained firm with her refusal, and defendant left the house. In about half an hour he returned to the house and

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

asked if he could stay there the next week. On being told no, he left the house again, but returned a few minutes later holding a shotgun. Ms. Kurtz and defendant struggled over possession of the gun. The struggle ended when defendant put the gun down. There followed a brief conversation. Ms. Kurtz then went out the front door and onto the front porch, followed by defendant, who had picked up the gun. According to Cynthia Kurtz, defendant said something to her mother and then shot her. According to Brenda Kurtz, defendant threatened to kill her mother and shortly thereafter shot her. Shortly afterwards, defendant shot himself in the neck. When police officers arrived, a short time after the shooting, they found him in his car in the driveway, together with the gun. He was immediately placed under arrest.

Ms. Kurtz, who was paralyzed in all extremities as the result of the shooting, was taken to a local hospital and then transferred to the University of Michigan Medical Center. On September 14, 1975, she was found dead in her hospital bed. Autopsy findings show that she had choked on some partially digested food which had caused a fatal reflex reaction.

On September 9, 1975, a police officer tape recorded a conversation with Ms. Kurtz.[1] At the

---

[1] [NOTE: This quotation is reproduced as it appears in the transcript, without attempt to correct the numerous errors.—REPORTER.]

"O.K. this is September the 9th, Tuesday, at 10:08 in the morning. I'm with Roberta Kurtz in U of M Hospital. This is Trooper Chaprman *(sic)* in reference to complaint #45-1221-75 1.5. Roberta now, her doctor has advised that she can talk to an officer. I'm going to ask her to give me a tape statement as to what happened leading up the time she was shot.

"ROBERTA: Saturday, I think it was he came down.

"CHAPMAN: This is who?

"ROBERTA: Junior Parney came down from his mothers from Albion. He stayed with us Saturday. We went to Devil's Lake. He stayed Saturday night in his own room there at the house. Then he

stayed, he went with us to Devil's Lake park to swim have a picnic out all day.

"CHAPMAN: This is who now, you * * *

"ROBERTA: Junior Parney, Cynthia, Brenda and Kenny, all the kids and I.

"CHAPMAN: Your children.

"ROBERTA: The children were with me all day—had a picnic and we swam on the beach and everything. So we left there Sunday night, came home, was setting in the living room and he says do you want me to go home to moms or not. And I said I don't care, don't make me any difference. Go home. Go home. I says I don't care one way or another. And he set around there a little bit. Finally he says, well, I guess I'll stay all night. I says, suit yourself.

"CHAPMAN: Now, this is what day?

"ROBERTA: That was on Sunday.

"CHAPMAN: That was Sunday.

"ROBERTA: Yup. Saturday night he stayed and Sunday we went to the beach all day and then Sunday night is when he said something about he really wanted to know if I wanted him to stay and I said I didn't care. So he went to his room downstairs and I went upstairs to my room with the children. So I got up the next morning.

"CHAPMAN: This would have been Monday morning?

"ROBERTA: Monday morning.

"CHAPMAN: August the 11th.

"ROBERTA: Ya.

"CHAPMAN: O.K.

"ROBERTA: And he—the house, Junior did, and he says, do you love me and I said no I don't love you no more and he says, why not? And I says I just don't love you no more so he says, he says are you going to marry me and I says no I am not going to marry you either. I says, look, I have 9 children. I love my children. I'm happy and I don't need you or any other man to get married to. Follow me? He said o.k. and he says like this, I'll leave.

"CHAPMAN: Do you remember about what time it was Roberta?

"ROBERTA: No, it was early in the morning.

"CHAPMAN: Early in the morning?

"ROBERTA: Finally Cynthia Ann and Brenda and Kenny were in the dining room and I was sitting in the living room. Cindy says, oh my God, mom, Junion is back and I says oh, for chrissakes, no. I don't know if I said chrissakes or not, but anyway, I says what are we going to do. So we panicked a little bit. So he came * * *.

"CHAPMAN: Were you afraid of him?

"ROBERTA: Yes, deathly afraid of him.

"CHAPMAN: Why?

"ROBERTA: Because I was always scared he was going to kill us.

"CHAPMAN: What made you think that?

"ROBERTA: Cause, he didn't want me to go out and have any fun. He wanted me right at home and he was so afraid that I would go out with another guy and he says if I ever did then he was going to kill

me and the other guy too. And he said maybe even the kids. He just
gives me the willies. And why I messed around with him this long I
don't know. I guess I thought maybe he would straighten up. But with
his mother like she is ever time we was about to get along good
together she would stick her nose in it and he would run up to
mother. So I thought, well, ain't much use to mess around. Anway,
anyway, he turned around and he come there to the front door. And
so he come in and he had this gun, big gun and he said—I said Jr.,
what are you going to do with that gun? He says, nothin. I says,
where did you get it? He says, it is mine, I just bought it. I said, you
can't have a gun. You ain't allowed a gun. You can't even buy a gun.
He says, well, I did and he said nobody is goin' to take it away from
me. So I went into the front hallway and he said—I said, set the gun
down. Let's reason this out. And he set it down against the wall and I
says, o.k., now come on. let's talk this straight out before somebody
gets hurt bad. And I looked at the kids. I thought maybe one of them
would take the hint and go around the outside the front and get the
gun. But I guess everybody was scared. Anyway, he wouldn't listen to
me whatsoever, so Cynthia and I, we started to scuffle with him. He
grabbed the gun. I think he—that we were going to take the gun from
him. So we turned around and I scuffled with him in the front
hallway and we got it outside and he got the gun out there near the
front porch and, you know, as we turned around the front porch, he
turned, he held the gun up and boom.

"CHAPMAN: With the shotgun. Did he say anything before that or
like * * *

"ROBERTA: I don't remember. And I said, oh no. Before he shot,
Cindy Ann said Jr., that gun is loaded. You are going to kill some-
body, you are going to hurt somebody. I can remember that. And then
all of a sudden boom and it hit me right here. (I can't hear what
follows here).

"CHAPMAN: You were on the porch there when we came. Do you
recall anything after that? What he did?

"ROBERTA: I laid there just like forze, you know, and I heard
another shot and I though, oh my God, he shot Cindy Ann, you know.
And then finally Kenny come around to me. He picks my head up and
said, momma, don't be afraid, God won't let you die. You're gonna
live. And then Kenny diaappeared. And then I remember your car
dirving in. No, not yours, Branch Co., no, the Lt. I think it was
Chapman. Right? He came in and he came up on the porch and he
says, Roberta, what happened? I said Jr. shot me. He said, that's all I
wanted to know. And then it seemed like they put Jr. up on those
steps to the East side and they snapped a picture of me.

"CHAPMAN: We took several pictures.

"ROBERTA: Then they put me in * * *

"CHAPMAN: You only recall two shots, that's all?

"ROBERTA: It seems like that's all.

"CHAPMAN: The second shot you heard I believe was when Jr.
shot himself.

"ROBERTA: I don't know.

"CHAPMAN: You haven't seen him since then have you?

"ROBERTA: No, and I hope I never do.

"CHAPMAN: O.K., well * * *

"ROBERTA: The only thing, when they put me in the ambulance and we went to Hillsdale and they wanted to put us in the same ambulance, I said no way. And so we got to Hillsdale and I think he was there and I was frantic and so when we left there to come up here I turned around and I thought he was in here not far from me. And I got a panic and I thought, get him out of here cause he'll have somebody kill me. I couldn't take it. Still to the day, drives me up the wall. I'm scared.

"CHAPMAN: O.k., how are you feeling now. O.k.?

"ROBERTA: Pretty good. The doctors—I get up in the wheel chair. They take me outside in the wheelchair and everything.

"CHAPMAN: How are you now, can you move your legs or not?

"ROBERTA: No, my left leg is paralyzed. My left arm so far down is paralized and I don't know. My right leg, its got some movement in it but very little.

"CHAPMAN: Who is your doctor now?

"ROBERTA: What is his name—doctor—. Something like that.

"CHAPMAN: O.K.

"ROBERTA: There is about 4 or 5 doctors.

"CHAPMAN: O.K. Well * * *

"ROBERTA: I think, I don't know what's gonna happen. I don't know where he's at.

"CHAPMAN: He is in custody right now. He's in jail.

"ROBERTA: I'm scared.

"CHAPMAN: Well, there is nothing to be afraid of. There's nothing more going to happen to you. All we want you to do is just rest and get better so you can go back home. Your kids are all dong fine. I have talked to them.

"ROBERTA: Yea. Well, I probably never will get back home.

"CHAPMAN: Well, I would't say that. You are doing terrific. You've made a miraculous recover. I thought you were gone to tell you the truth.

"ROBERTA: Yes, I know it.

"CHAPMAN: Apparently you are stronger than what we think you were.

"ROBERTA: —.

"CHAPMAN: Well * * *

"ROBERTA: People never no do they. I didn't know. Tell I came in though but I don't know. Even his mother. You look at her. She's got those black eyes. Just like God. You either step or else you know. And so I don't know. But his mother knew that he was not allowed any gun and she would turn around and deliberately let guns and everything else lay around just so, you know. So I think it is just as much her fault as it is his. O, by the way, my mouth's so dry. Are you gonna have a Court hearing?

"CHAPMAN: now, we are going to have a hering on the 25th of September. It will be a couple weeks yet and I don't think you are going to be able to make it. That's why we need this statement. You

trial, the prosecution offered this recording in evidence as a dying declaration of the deceased, and the defense objected to its admission as being hearsay testimony. The trial court, after research and discussion with counsel, admitted the recording as a dying declaration, and it was played for the jury. This is the basis for one of two claimed errors on appeal.

Defendant requested the trial court to instruct the jury on the lesser included offense of manslaughter. This the court refused to do because it found no evidence to support such an instruction. This is the basis for defendant's second claim of error on appeal.

Defendant had originally pled guilty to second-degree murder, but this Court vacated the conviction because of defects in determining his competency. *People v Parney,* 74 Mich App 173; 253 NW2d 698 (1977). In this trial defendant presented an insanity defense. After less than an hour's deliberation, the jury returned a verdict of "guilty but mentally ill" of second-degree murder, MCL 750.317; MSA 28.549. Defendant appeals as of right from the verdict.

We first consider the claimed error in the trial court's admission into evidence of the taped statement of Ms. Kurtz made to Michigan State Police Trooper Chapman as a dying declaration.

In defendant's view, the people failed to clearly establish that Ms. Kurtz's statement was made while she believed that her death was impending.

don't have to worry about anything. O.k., well, thank you for giving me the tape.

"ROBERTA: What am I gonna do? Can you sue him for me?

"CHAPMAN: No, I don't think we can sue him, but * * *

"ROBERTA: Disability? Cause I can't work the rest of my life. I'm done for.

"CHAPMAN: Well, I don't know. You'll have to talk to your attorney about that, o.k.?"

*People v Johnson,* 334 Mich 169, 173-174; 54 NW2d 206 (1952). The statement itself would not indicate such a belief, and a review of the autopsy report indicates an opinion that she had been gradually improving up to the time of her death. Defendant claims that, because of the presentation of an insanity defense, his state of mind and the circumstances leading up to the shooting were crucial to his defense and the admission of the statement was prejudicial to this aspect of the defense.

The people assert that because the trial court gave full consideration to the question, determining that the statement was made *in extremis,* this Court should not overrule that finding. The people also claim that even if the admission of the statement was error there was ample support in the record for the jury's verdict aside from the statement so that the error should be considered harmless.

The record indicates that the trial court found the following remarks in the statement significant:

"CHAPMAN: Well, there is nothing to be afraid of. There's nothing more going to happen to you. All we want you to do is just rest and get better so you can go back home. Your kids are all doing fine. I have talked to them.

"ROBERTA: Yea. Well, I probably never will get back home.

"CHAPMAN: Well, I wouldn't say that. You are doing terrific. You've made a miraculous recovery. I thought you were gone to tell you the truth.

"ROBERTA: Yes, I know it.

"CHAPMAN: Apparently you are stronger than what we think you were.

"ROBERTA: —

"CHAPMAN: Well * * *."

The foregoing, when considered together with the testimony of an ambulance attendant who recalled that on the ride to the hospital Ms. Kurtz said, "I'm going to die, aren't I?" evidently led the court to conclude that Ms. Kurtz had a continuing consciousness of impending death throughout her stay in the hospital and that this satisfied the factual basis for finding that the statement qualified as a dying declaration.

An out-of-court statement made by a declarant who is not available for cross-examination is normally inadmissible as being hearsay. However, dying declarations are an exception to the hearsay rule. MRE 801, 804(b)(2). MRE 804(b)(2) allows the admission of a statement made by an unavailable defendant when:

"In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death."

Thus, four requirements must be met before a statement can be admitted as a dying declaration. *People v Schinzel,* 86 Mich App 337, 342; 272 NW2d 648 (1978):

(1) The declarant must have been conscious of impending death;

(2) Death must actually have ensued;

(3) The statements are sought to be admitted in a criminal prosecution against the individual who killed the decedent; and

(4) The statements must relate to the circumstances of the killing.

It is the trial court's duty to determine whether a statement is admissible as a dying declaration.

*People v Johnson, supra, People v Fritch,* 210
Mich 343, 347; 178 NW 59 (1920). The Court is
aware of the case of *People v Denton,* 312 Mich 32;
19 NW2d 476 (1945), wherein Justice WIEST, in the
course of his opinion, appears to consider it a jury
question. However, the trial court had in fact
made a determination as to the admissibility of
the declaration under review, and the question of
who was to make the determination of admissibil-
ity was not an issue in the case. Thus, we do not
consider the case as authority for delegating to the
jury the duty of determining whether a statement
is admissible as a dying declaration.

In this case only the requirement that the de-
clarant be conscious of impending death when the
statement was given is brought into question. The
trial court found that it was.

The standard for review of a trial court's deter-
mination of the question of whether or not a
statement is admissible as a dying declaration is
not clear. That it is subject to review, as would be
any other evidentiary ruling, is clear.

Apparently, the last case addressing the ques-
tion of the standard for reviewing a trial court's
determination as to the admissibility of a state-
ment as a dying declaration was *Johnson, supra,*
174, where the Court said:

"Because of the dangerous nature of dying declara-
tions, the public policy of according an accused every
possible safeguard consistent with justice and the con-
stitutional guaranties of a fair trial, those preliminary
matters necessary to be determined before the admis-
sion of a dying declaration should be clearly estab-
lished."

The preliminary matters the Court refers to are
the factors required to make a statement a dying

declaration. In determining whether or not the factors exist, the trial court must reach factual conclusions. A reviewing court will not set aside the trial court's findings of fact unless they leave the reviewing court with a definite and firm conviction that the trial court made a mistake. In other words, that such findings of fact were clearly erroneous. GCR 1963, 517.1; 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), pp 596-597. No case has expressly applied the clearly erroneous standard to the trial court's factual findings that a statement is a dying declaration. However, such a standard applies to bench trials as well as preliminary trial court factual conclusions in jury trials, and this Court would apply it as the standard for review of the trial court's findings that the statement in this case was a dying declaration.

We find little support for the trial court's finding that Ms. Kurtz clearly had a consciousness of impending death when she made the statement. Her injuries were serious, and her paralysis was probably permanent. Also, she did make the statement that she probably never would get back home, but moments before making that statement she said she was feeling good and that her doctors had taken her outside in a wheel chair. Soon after making the statement, she asked about suing defendant as she expected she would be unable to work. Also, the autopsy report described Ms. Kurtz as "recuperating" and stated that she appeared to be recovering fairly well over a period of approximately one month. (See pertinent portions of the autopsy report.)[2]

---

[2] "A-104-CB Kurtz, Roberta #1399732-9
                   Clinical Summary
"The patient was a 48 year old female who sustained a shotgun wound to the left anterior neck on August 11, 1975. She was taken to

We find that the record does not clearly establish the fact that Ms. Kurtz was conscious of impending death when she made the taped statement. Her statement about never getting back home could have been based on her paralysis rather than possible death. We are not persuaded that the trial court's theory of continuing consciousness of impending death extending over a period of 29 days is so clearly established that it

---

a hospital in Hillsdale and then transferred to the University of Michigan Medical Center. Upon admission, there was a large gaping wound in the left anterior neck and exit wounds in the posterior neck and posterior upper thorax. There was apparent damage to the left brachial plexus. Angiograms showed that there was no damage to major arterial vessels in the neck. She underwent laminectomy with debridement of the wound. She received several blood transfusions. There was contusion of the spinal cord and laceration of the dura over the cord. Esophagoscopy and bronchoscopy revealed no abnormality.

"Her postoperative course was relatively good with the exception of psychotic behavior. She was treated with Mellaril. She also received Colistin for urinary track infection. An additional operation was done in which a skin graft was placed over the wound in the neck. Her head was placed in braces. Her neurological status was one of quadriparesis with complete paralysis and loss of sensation of the left arm. There was no improvement in this status, however she appeared to be recovering fairly well over a period of approximately one month. On September 14, 1975, she was found dead in bed at 1:40 p.m. approximately 35 minutes after having been seen the nurse for therapy to her wound.

"The body was identified to me by Trooper Louis Frizzell of the Michigan State Police.

"A-104-CB Kurtz, Roberta #1399732-9

Clinicopathologic Correlation

"This woman had severe damage to her cervical spinal cord as a result of a shotgun wound in the left neck. She had paralysis of all extremities because of it. Although she was recuperating, the damage in her cord still caused her to be in a very precarious condition.

"Autopsy findings showed a large amount of partially digested food in her stomach. Part of this had been aspirated into her larynx, trachea, and bronchi. This aspiration caused a reflex reaction which caused her to stop breathing and/or the heart to stop beating. As a result, the lungs became congested and edematous.

"The amount of aspiration was small. However, her general health was poor because of the shotgun wound, and this made her more likely to be affected by a slight insult.

"W. J. Fidler, M.D."

overcomes the medical reports and Ms. Kurtz's other tape recorded statement. Therefore, we find that the trial court erred when it found that the taped statement was a dying declaration.

However, the admission of the statement does not require reversal of defendant's conviction. It was harmless error. MCL 769.26; MSA 28.1096. The statement shed little, if any, new light on defendant's state of mind. Eyewitnesses to the shooting and defendant's relatives gave ample testimony as to his nervous characteristics and possible state of mind. If anything, Ms. Kurtz's testimony was corroboratory in that respect. Certainly the error does not offend the maintenance of a sound judicial system, nor is it likely that the exclusion of the statement would have changed any juror's vote. *People v Wilkins,* 82 Mich App 260, 272; 266 NW2d 781 (1978), *lv gtd* 403 Mich 849 (1978), *People v Sherman Hall,* 77 Mich App 456; 258 NW2d 517 (1977).

The second claim of error concerned the trial court's refusal to instruct the jury on manslaughter.

Manslaughter is not statutorily defined in Michigan, as the manslaughter statute, MCL 750.321; MSA 28.553, only discusses the penalty. Case law, however, has established two types of manslaughter, voluntary and involuntary. Voluntary manslaughter shares all the elements of murder except the element of malice. *People v Townes,* 391 Mich 578; 218 NW2d 136 (1974), *People v Younger,* 380 Mich 678, 681; 158 NW2d 493 (1968), *People v Van Wyck,* 402 Mich 266; 262 NW2d 638 (1978). Proof of some sort of provocation or other mitigating circumstance is necessary to return a verdict of guilty of voluntary manslaughter where there has been an intentional homicide. See *People v Mor-*

*rin,* 31 Mich App 301, 310-311; 187 NW2d 434 (1971), *People v Townes, supra,* 589.

Involuntary manslaughter arises when a death occurs without malice and unintentionally but rather as a result of gross, criminal, and culpable negligence or inadvertence. *People v McKee,* 15 Mich App 382; 166 NW2d 688 (1968), *People v Berles,* 30 Mich App 716; 186 NW2d 852 (1971), *People v Townes, supra,* 590-591.

Manslaughter, while not a necessarily included offense of murder, may well be an included offense if the evidence adduced at trial would support a verdict of manslaughter. *People v Van Wycke, supra,* 269-270. Further, it is reversible error for the trial court to fail to instruct on manslaughter where there is evidence to support such a theory and a proper request for such an instruction is made. *People v Van Wycke, supra,* 270, *People v McIntosh,* 400 Mich 1; 252 NW2d 779 (1977), *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975).

In this case the evidence indicated that the defendant was distraught when he returned to decedent's home. There was a struggle for control of the gun, a continued argument, defendant's following Ms. Kurtz to the porch and, after a very short period, shooting her.

While there was sufficient evidence to support a conviction of second-degree murder, it is equally possible that defendant, although not insane, was sufficiently unbalanced or deranged by his arguments with Ms. Kurtz that he lacked the capacity for malice necessary for a jury to find him guilty of second-degree murder. The alternatives should have been presented to the jury for determination.

Defendant's conviction is reversed and the case is remanded to the trial court for entry of a

conviction for manslaughter and resentencing or, in the discretion of the prosecutor, a new trial on the original charge.

Reversed and remanded.

MACKENZIE, J. *(dissenting)*. I dissent. I am unable to conclude that the trial judge erred in refusing to instruct the jury on manslaughter.

As noted by the majority, where there has been an intentional homicide, there must be proof of adequate or reasonable provocation before a verdict of guilty of voluntary manslaughter may be returned. I disagree with the majority that the provocation element could be satisfied by the fact that defendant became unbalanced or deranged by his argument with the decedent.

An examination of the record reveals that defendant and the decedent were arguing over whether defendant could spend the next weekend with the decedent and her family. After extensive arguing, defendant left the house and returned with a shotgun. Although defendant and the decedent struggled over the gun, the struggle ceased after the decedent was unsuccessful in her efforts to obtain it from defendant. The decedent then walked out onto the porch and defendant followed. Defendant apparently spoke some words and then shot the decedent.

If defendant was provoked by the argument, the specific provoking actions were spoken words. The physical struggle over the shotgun had clearly ceased prior to the exit from the house onto the porch by defendant and the decedent. It is a general rule at common law that language alone, "however aggravated, abusive, opprobrious, or indecent", is not sufficient provocation to reduce a killing committed with a deadly weapon from

murder to manslaughter. 40 Am Jur 2d, Homicide, § 64, p 357, 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1665, p 700. There have been a few exceptions to this rule. However, the deviations have occurred primarily in cases where the words convey information of a fact which would constitute reasonable provocation if the fact was observed, such as confession of adultery to a spouse. See LaFave & Scott, Criminal Law, § 76, p 576-577. Although the rule has been deviated from in a limited number of cases, I do not believe deviation is appropriate in the instant case, which involves two nonmarried parties prone to having quarrels.

The fact that defendant may have been rendered "unbalanced" or "deranged" by the argument does not transform a legally insufficient provocation into a legally sufficient one. It is important to emphasize that defendant's mental stability was considered by the jury, as defendant presented an insanity defense. Although the jury was unable to find that defendant was legally insane, it did render a verdict of "guilty but mentally ill".

Finally, I am unable to conclude that the trial judge erred in refusing to instruct on involuntary manslaughter. I agree with the trial judge that the evidence did not indicate the occurrence of a negligent act. This viewpoint is buttressed by the fact that the defense to the killing proffered by defendant was insanity.

I would affirm.